**No. 1,124.**

S. C. HASTINGS, RESPONDENT, *v.* JOHN DEVLIN, APPELLANT.

LOCATION OF SCHOOL LAND WARRANT ON UNSURVEYED LANDS.—The location of a school land warrant issued under the Act of May 3, 1852, upon unsurveyed lands of the United States, is void and confers no right whatever upon the locator.

EVIDENCE.—ILLEGAL CERTIFICATE.—A certificate issued by a Register of the United States Land Office, which was unauthorized by statute or by regulation of the Land Department of the United States, is inadmissible in evidence in an action involving title to land.

APPEAL from the District Court of the Seventh District, Solano County.

Plaintiff claims that title to the premises in dispute, vested June 20th, A. D. 1853, in I. Thomas, by virtue of the location of School Land Warrant No. 133, under and in accordance with the provisions of the Act of the Legislature of the State of California, passed May 3, 1862, entitled, "An Act to provide for the disposal of the five hundred thousand acres of land granted to this State by Act of Congress" of September 4, 1841, and that plaintiff acquired title by a Sheriff's deed.

Defendant denies the location of said land warrant, and shows in himself actual possession and a patent from the State, dated March 20th, 1863. This patent issued upon a location of a school land warrant located February 14, 1857.

Plaintiff offered in evidence under objection and exception on the part of defendant, three several documents, to show that title had vested in I. Thomas by a location of said Land Warrant No. 133. First—A certified copy of the County Records showing an attempt to locate the warrant by the County Surveyor under the Act of May 3, 1852.

Second—The-following certificate of the Register of the United States Land Office at Benicia:

LAND OFFICE,
Benicia, December 24th, A. D. 1863.

*No.* 9.   It is hereby certified that I. Thomas has this day located at this office the south half of Sec. No. 14, Township No. 5, North, Range No. 1 West, containing 320 acres, under Warrant No. 133 issued under the Act of the California Legislature approved the 3d day of May, 1852, in part satisfaction of the grant made by the 8th section of the Act of Congress approved the 4th day of September, 1841.

[Signed]                              W. W. GIFT,
*Taken for* 320 *acres.*                         Register.

Third—The following document purporting to be a certificate of the Register of the Land Office at Stockton:

STATE OF CALIFORNIA,
United States Land Office, Stockton District.
December 26th, 1864.

I, S. T. Nye, Register of the United States Land Office for the Stockton Land District, do hereby certify that the California State School Land Warrant No. 133, issued in the name of Samuel P. White for three hundred and twenty acres, was located by I. Thomas on the 24th day of December, 1853, upon the south half of Section 14, in Township No. 5, North, Range No. 1 West, Mount Diablo meridian, is now on file, and that the word *surrendered* has been written across the face of said warrant; and I further certify that the lands above described have been duly surveyed by authority of the United States Government, and the plats of such survey have been approved by the Surveyor-General, and that the location conforms to such survey, and that the location of such warrant has been made or filed in the United States Land Office for the district in which the land is situated, with the consent of the Register and Receiver of the San Francisco Land Office.

Witness my hand and official seal this 26th day of December, 1864.                              S. T. NYE,
[SEAL]                                   Register.

Judgment was for plaintiff.   Defendant moved for a new trial, which was denied and he appealed.

The other facts are stated in the opinion.

*M. A. Wheaton*, for Appellant.

*First*—The first document offered in evidence by plaintiff, merely showed an attempt to locate a school land warrant upon unsurveyed lands, and for this reason alone it was clearly inadmissable. In addition to this, however, it was only a temporary location under the State law of May 3, 1852; and this law does not provide that such location shall vest the title, but only gives a right of possession until the lands are surveyed. (Statute 1852, p. 868.)

Section 14 of the Act providing that patents should issue under some future law, affirmatively shows that the Legislature did not intend such location to vest any title. As this Act only provides for such locations to be made upon unsurveyed lands, any location under the Act must be utterly void.

*Second*—The certificate of Gift was issued without any authority of law whatever. There was no law in December, 1863, authorizing the Register of the Land Office to either make or issue any such certificate. The most that can be claimed for the law of Congress is that it authorized the State to *select* by its authorized agent, the lands granted for internal improvements. Taking sections 3, 4, 5, 6, 10, 11 and 14, of the Act of May 3, 1852, together, and it is plain that it provides only for the location of land warrants upon unsurveyed lands, and does not provide either by language or intention, for selecting the lands through the United States Land Office.

The Act does not in any place refer to the United States Land Office at all; it does not refer to the United States Register at all; it does not provide for filing the warrants in any United States office, or with any United States officer, either at the time of the location or at any future time. It only provides for a temporary location, leaving it for future Legislatures to provide the method of converting such locations in the County offices into regular State selections in the United States Office.

There was therefore no law, either of this State or of the United States, for making the location as certified to, and

and none for making or issuing the certificate, and the certificate was not therefore even *prima facie* evidence of title. Indeed it was not evidence at all—no evidence, either of the truth of what it recited or of anything else.

*Third*—The certificate of S. T. Nye, Register of the Stockton Land Office, is void upon its face. It is without any authority of law, and incompetent as evidence.

*William S. Wells*, for Respondent.

The action of the United States officer in accepting our location is not open to objection. It was the action of the Executive Department of the Government in carrying into effect the grant to the State, and the mode and manner of its exercise is not subject to review by the Courts, particularly when both parties claim under the same grant. (*McLarry* v. *Sullivan*, 2 Wheaton, 369; *McIntire* v. *Wood*, 7 Cranch. 504; *United States* v. *Fevreira*, 13 How. 40, 52; *Foley* v. *Harrison*, 15 Id. 433; 2 Washburn on Real Property, 528; quoted from 5 Porter's Ala. Rep., p. 243; *McConnell* v. *Wilcox*, 1 Scammon, 345.)

It will, in the nature of things, be a qualification to any grant that it shall not affect pre-existing titles emanating from the same source. We cannot countenance the presumption that the Government will do that which, in the subject, we denominate fraud—that is, grant the same land twice.

The location of Thomas and the subsequent conveyance, vest the title in the plaintiff.

The Act of 1852 provides for the sale of the warrants, prescribes the manner of their location and *ex industriœ*, provides that the location shall secure the right of possession to the locator until the Government survey be made, and then shall be made to conform thereto. (Stat. 1852, p. 860. Hittel's Dig. Art. 3975.)

The same Act provides for the issuance of a patent (Art. 3984,) and the Act of April 30, 1857, expressly saves all rights acquired under the Act of 1852.

We do not pretend to stand upon anything in the nature of an equitable title, but upon strict legal right—a priority

of purchase and location, evidenced by the most public act and by a record which of itself, imparts notice of our claim and makes the subsequent action of the defendant, fraudulent as against our claim. (*Watson* v. *Robey,* 9 Cal. 54.)

As regards the effect of our location, we cite: (*Nims* v. *Palmer,* 6 Cal. 13; *Watson* v. *Robey,* (*Supra*); *Doll* v. *Meader,* 16 Cal. 296; *Valkenburg* v. *McCloud,* 21 Id. 330; *Rhodes* v. *Craig,* 21 Id. 419.)

In the case of *Moore* v. *Wilkinson,* (13 Cal. 478,) the Court says: "Individuals can resist the conclusiveness of the patent only by showing that it conflicts with prior rights vested in themselves." "The most we find claimed by the authorities, as to the conclusiveness of a patent, is that it so operates against all those whose rights did not commence previous to its emanation." (2 Washburne on Real Property, 526.)

This Court in *Doll* v. *Meader,* cited above, seem to except, throughout the opinion, the case where a party with a title from a common source conflicts with a patent. (*Terry* v. *Megerle,* 24. Cal. 609; *Kile* v. *Tubbs,* 23 Id. 432; *Megerle* v. *Ashe,* 27 Id. 322.)

Under these decisions we insist that the location of the land vests a title which needs no further act or patent to convey; that a title thus vested is, as a title by grant, equal to a patent, and if prior in time, prior also in right; and that under such circumstances, the effect of the patent is well described as not conclusive, "as against a grant made by the legislative department prior thereto;" and that it could have no operation beyond that of a mere-quitclaim.

SAWYER, J., delivered the opinion of the Court, SANDERSON, J., and RHODES, J., concurring:

This is an action to recover land. The plaintiff relies upon a location of a school land warrant made in 1853, under the Act of May 3, 1852, authorizing the location of school land warrants on lands-of the United States, as a part of the five hundred thousand acres granted to the State by the eighth section of the Act of Congress of September 4, 1841.

The defendant is in possession, claiming title under a patent from the State, dated March 20, 1863, issued in pursuance of the location of a school land warrant, made February 14, 1857. The plaintiff must show title to enable him to recover. He introduced in evidence, under objection and exception' on the part of defendant, a certified copy from the County Recorder's office, of a survey made by the County Surveyor of Solano County, on the 20th of June, 1853, at the request of one Isaac Thomas, for the purpose of locating School Land Warrant No. 133, in pursuance of the provisions of the Act of May 3, 1852. It was filed for record June 25, 1853, and all the acts required by statute had been performed on that day. At this time, the final surveys by the United States had not been made. We have already held that unsurveyed lands are not subject to selection under the Act of Congress; and that the locations of school land warrants under the Act of May 3, 1852, upon such lands, conferred no right whatever on the locator. ( *Terry* v. *Megerle,* 24 Cal. 610; *Grogan* v. *Knight,* 27 Id. 520.) The location of School Land Warrant No. 133, on the 20th and 25th of June, 1853, was a nullity and conferred no rights in the land upon the locator. No subsequent Act of the Legislature has been called to our attention—and we have found none passed since the final survey, which constitutes the said location a valid selection on behalf of the State of the lands so located, or renders that Act valid. It was void when made, and has not been made valid by any subsequent legislation. Subsequent Acts have been passed authorizing warrants issued under the Act of 1852, to be located upon surveyed lands, subject to selection; but no evidence was introduced showing that Warrant No. 133, had been located upon the lands in question, in pursuance of such subsequent Acts. The rights of plaintiff, so far as shown by the evidence, depend upon the location, under the Act of 1852, and, as we have seen, that location conferred no right at all. The certificate was, for the reason indicated, improperly admitted in evidence, and, being in, shows no right to recover.

We know of no statute of California, or of the United States, authorizing the performance of the acts set forth in the certificate of Gift, Register of the Land Office at Benicia, of December 24, 1863, or any statute or principle of law making the certificate evidence of the facts stated. Its admission in evidence was error. The same may be said in respect to the admissibility of the certificate of S. T. Nye, Register of the Stockton Land Office, of December 26th, 1864. This certificate is not a certified copy of any record in his office. It is simply a statement of facts within his knowledge relating to past transactions. We have not been referred to any statute or authority showing such statements to be competent evidence for the purpose for which it is now sought to be used. It is offered in evidence in a Court of justice upon a litigated point respecting title to lands—not presented as the certificate of an officer of one Department of the Government, for the information of another upon a matter relating to the duties of his office, in pursuance of the provisions of some statute, or regulation of the respective departments describing the course of their proceedings. Nor is it offered to show the fact that such a certificate was presented to and acted upon by an officer of the Government, or was the link in the chain of an official proceeding resulting in a patent. It was offered as competent evidence to establish the facts therein recited. We know of no statute or principle of law, taking this certificate out of the ordinary rules of evidence applicable to proceedings in Courts of justice. We think it was improperly admitted. The view taken renders it unnecessary to consider the question as to the validity of defendant's patent.

Judgment and order denying a new trial reversed, and a new trial granted.

CURRY, C. J., and SHAFTER, J., expressed no opinion.

Subsequently, upon petition of respondent a rehearing was granted.

*W. S. Wells*, for Respondent, on Rehearing.

*First*—The Act of 1852 was an attempt on the part of the State to dispose of her lands in advance of the action of the General Land Department, but manifests no intent, or even attempt, in any way, to deprive the General Land Department of its supervisory power.

The Act of 1841 allows the State to select the lands in such manner as the Legislature may direct; but the mere act of selection does not imply location in its full sense. It was competent for the State, acting through the Legislature, or the agent of the State, whose warrant, issued under the Act of 1852, was his letter of authority to select any given half section by merely designating it; and so far as the United States is concerned, or in fact the State herself, if her agent chooses to select at random any given section, taking the chances in every respect as to how, when, and against whom it might fall, she has no complaint to make. That selection, thus made, appropriates the land, and had there been no law upon the subject, it is hard to see what objection the United States could make to the mere act of selection thus evidenced. If, however, when the selection was to be located, that is fixed upon the ground, and the plats filed, adverse pre-emption or other superior rights had attached, it was liable to be defeated; but this mere liability *per se* should not be allowed to operate to defeat the title.

The Act of 1841 (Sec. 8, Lester's Land Laws, p. 61.) implies a difference between the act of selection and location. The one is left to the State, while the other implies the constant supervision of the General Government. Thus it refers to sectional divisions and sub-divisions peculiar to, based upon, and in conformity with the system of our Land Department, and known only to the States by the connection of their land system with the Department, and existing only where originally adopted by the General Government or necessarily connected with the public surveys. It reserves lands by the action of the General Government; it stays the final act of location, but not the selection, until survey.

True it is that the Act of 1852 authorizes no distinction, for it nowhere uses the term "selection;" but in arguing the force of the act of 1841, in connection with our State legislation, we may properly insist that we can allow the action under the law of 1852, to operate to the full extent to which the State or her agent was authorized to proceed.

The first section of the Act authorizes the issuance of land warrants. The second section authorizes the location—erroneously so termed, for it is not only different from, but contrary to, a location in its essentials, as defined in the Act of 1841. The fourth section provides for survey and entry in office of County Clerk, and the fifth and sixth provide for the protection of the rights of the agent of the State until the location shall be made, and prescribes the mode of proceeding in case of non-conformity with the survey of the General Government, or a conflict. The tenth and eleventh sections provide for a survey and full record of the appropriation of the land.

All this has been complied with on our part; every step there indicated has been pursued by us; our selection was duly made, surveyed and recorded; and, more than that, it had become final, not only as to the State, but as to the United States, for we produce the approval of the United States Register of this location, made immediately upon and following the completion of the survey. In *Megerle* v. *Ashe*, (33 Cal. 74), since affirmed by this Court in *Smith* v. *Athern*, (34 Id. 506), it is settled, that upon a location on a particular parcel of surveyed land, "selected and located," says-the Court, "in accordance with the provisions of the Act of Congress, when the selection and location have been made by the proper officers or agents, acting on behalf of the State, in such manner as the Legislature has-directed, and the selection and location has been approved by the proper officers of the United States, then the identification of the land has made the title perfect, and attached it to the particular tract settled." It is essential, under the Act of 1841, that the Legislature of the State shall direct the mode and manner of selection, and it seems

equally essential, and, in fact has always been so considered in the case above cited, and in all others where the subject has been under discussion—that the final approval of the United States officers was necessary to perfect the title thus sought to be acquired.

*Second*—The certificate of the Register of the United States Land Office, showing the location of plaintiff's school land warrant, is something more than a certificate. It is the approval of the United States officer, insisted upon as essential to the location in *Megerle* v. *Ashe, (supra)*. It is, in fact, the location itself, so far as the United States is-concerned. It is one of the means adopted and sanctioned by the Executive Department of the Government in carrying out the law of the land; and this being the case, the document thus issued has at least the force of a certificate of location as against the United States. (Stats. 1859.)

There then comes to our aid the Act of the State Legislature, (Hittell's Digest, 703), which makes our certificate *prima facie* evidence of title.

*Third*—In the present case the first question is: Has the title passed from the United States? The second: Has it vested in the plaintiff as the vendee of the State? The first question depends exclusively on the laws of the United States, and must be determined by those laws. As to the second, we have only to refer to the Act of 1852, and are entitled to invoke its protection fully. By it we are secured in the possession of the land, subject only to be defeated so far as we may conflict with the United States surveys and rights existing at the-date of the selection. The State in her own behalf, has no right to question our act. If, by any accident, mischance, blunder or otherwise, she has sold the same land twice, every principle of fair dealing forbids that she shall prefer the later purchaser, or the title of either. If the United States recognizes the fact (and in this case and upon this record she does), that the title has passed from her to the agent of the State, the only question remaining is between the State and her agent, as to whether the provisions of the Act of 1852 have been observed, and the

plaintiff has brought himself within them. If he, as the agent of the State has observed the provisions of the Act, has made the selection as therein provided, the matter is at an end as between the State and him; and if the United States has approved it, the location is perfect, and the question must end here.

That the question as to whether title has passed from the United States must be determined by the laws of the United States alone, we cite: *Wilcox* v. *Jackson*, (13 Peters, 498); *United States* v. *Fitzgerald et al.*, (15 Id. 407;) *Lessee of Hickey* v. *Stewart*, (3 Howard, 750); *Bagnall* v. *Broderick*, (13 Peters, 450.)

*M. A. Wheaton*, for Appellant, for Rehearing.

*First*—By the eighth section of the Act of Congress of September 4, 1841, (Lester, p. 61.) five hundred thousand acres of land were granted to the State "for purposes of internal improvement," "the selections in all of the said States to be made within their limits respectively, in such manner as the Legislature thereof shall direct, and located in parcels, conformably to-sectional divisions and subdivisions of not less than three hundred and twenty acres in any one location on any public land," etc., "which said location may be made-at any time after the lands of the United States in said States respectively, shall have been surveyed," etc.

The admission of California into the Union, with Section 2 of Article IX in her Constitution, by Act of Congress indirectly changed the proceeds of the sales of the lands from an "internal improvement" into a school fund.

The title to these lands vested in California the moment she was admitted as a State into the Union, but they had yet to be selected and located. These two words, "selected" and "located," are almost identical in meaning; taken as they occur in said section eight, they both together mean choosing and segregating these lands from the mass of public lands within the State.

In the Act of May 3, 1852, the Legislature undertook to dispose of the said lands, (Stats. 1852, p. 41). As by the

Constitution of this State, every law of the Legislature "shall embrace but one object, and that object shall be expressed in the title," (Art. IV., Sec. 25); it is very certain that the object of the law was to dispose of the land, the provisions of the law contained the method and manner which she, in mistaken belief of unlimited power over the subject, conceived to be proper to adopt in making such disposition.

So much of the Act as provides for locating the warrants upon unsurveyed land, is in conflict with the law of Congress making the grant, and is void. (Const. U. S., Art. VI., Second Subdiv.)

The provisions of the Act being in conflict with the provisions and terms of the grant to the State, may well be challenged as legislative acts impairing the obligations of a contract. (*Terry* v. *Megerle*, 24 Cal. 624; *Grogan* v. *Knight*, 27 Id. 515.)

On this account, so much of the Act of 1852 as provides for the selection and location of unsurveyed lands, must be totally rejected as utterly void; and this portion of the Act being got rid of, the remainder is more easy to comprehend, and still holds good. (*Lathrop* v. *Mills*, 19 Cal. 530; *Robinson* v. *Bidwell*, 22 Id. 386; *Warren* v. *Mayor of Charleston*, 2 Gray, 98; *French* v. *Teschmacher*, 24 Cal. 546.)

Sections one, two, three, seven, eight, nine, thirteen, fifteen, sixteen and seventeen of the Act can all be sustained, while sections four, five, ten, eleven and twelve, should be rejected as conflicting with the law of Congress and the conditions of the grant, because providing for nothing but locations upon unsurveyed lands. Section six would also seem to be unnecessary to the location of surveyed lands, and section fourteen is unnecessary for any purpose except to assist in showing the intention of the Legislature.

It is plain, that while the Legislature, acting beyond her powers, made extraordinary provisions for the selection and location of unsurveyed lands, yet the whole Act was not exhausted in such illegal usurpation, but portions of it, including all of section three, provide for selection and loca-

tion, according to law, upon surveyed lands, and said section places the owner of the warrants in the shoes of the State, and they have the same right to choose the manner of making the selection and location which the State itself would have had, had she not sold the warrants.

Statutes are to be construed according to their meaning and intention, even when the strict letter of the statute is otherwise. (*Knowles* v. *Yeates*, 31 Cal. 86–7; 1 Kent's Com. 461.)

*Second*—We are still of the opinion that neither of the exhibits offered in evidence was any legal evidence of title. The first shows only a location upon unsurveyed lands, and is, of course, void; the second was not issued under any law of this State, or of the United States, and hence was not *prima facie* evidence under our statute, (Hittell, 703); the third is void upon its face, as Nye, the Register of the Stockton office, could not lawfully certify to the consent of the Register of the San Francisco office. The exhibit is issued without authority of law, and is no legal evidence.

The certificates were not copies·of the records and consequently were not legal evidence. (Hittell, 5583; Practice Act, Sec. 447; *Gregory* v. *McPherson*, 13 Cal. 572–3–4.)

RHODES, C. J., delivered the opinion of the Court; CROCKETT, J., TEMPLE J., and SPRAGUE J., concurring:

At the former hearing of this case, it was held that the location of school land warrants, issued under the Act of May 3, 1852, upon unsurveyed lands was void, and conferred no right whatever upon the locator. That proposition is beyond controversy in this State. (See *Terry* v. *Megerle*, 24 Cal. 610; *Grogan* v. *Knight*, 27 Cal. 520.) The location of the warrant, under which the plaintiff claims, having been made before the lands were surveyed by the General Government, neither conferred title on the locator, nor gave him the right to the possession of the lands described·in the certificate of location.

It was also held, at the former hearing, that the certificate issued by the Register ꜰ the Land Office at Benicia, was

improperly admitted in evidence.  The argument on the re-
hearing, has not weakened our convictions on this point.
The Act of 1852 does not call for, or recognize such a cer-
tificate, nor was it authorized by any law of Congress or
regulation of the Land Department.  The instructions of
the Commissioner of the General Land Office, to which the
plaintiff refers, bear a date subsequent to that of the certifi-
cate, and therefore cannot be accepted as authority to the
Register to issue the certificate.

It is unnecessary to consider at any great length, the
various provisions of the Act of 1852, for the purposes of
this case; and besides this, the Act was drawn under a mis-
conception of the power of the Legislature; and it is im-
possible to bring all the provisions of the Act into harmony.
The plaintiff contends, that the person holding the warrant
under which he claims, was authorized to select the land on
behalf of the State, in part satisfaction of the grant of 500,-
000 acres, and that the land might therefore be located in
accordance with law—the point of the argument being, as
we understand counsel, that the selection of the land vested
the title in the State, and that the locator of the warrant,
having pursued the provisions of the Act of 1852, is entitled
to the possession of the land.  We say "as we understand
counsel," for although he has presented very fully the lead-
ing, if not all the considerations applicable to his side of
the several questions involved in the case, he has, neither in
his brief on the former, nor on this hearing, stated the
points—the legal propositions—which, in his view, arise
upon the facts of the case, and which, if maintained, en-
title him to judgment.  It materially lessens the labor of
the Court to have each point upon which counsel rely, fully,
precisely and clearly stated, before proceeding to the argu-
ment.  And this course will materially lighten the labor of
counsel also, for it may safely be said that four points out
of five need only to be stated, for, when stated with the re-
quisite precision, their truth is apparent without argument;
or it may happen, that when so stated, they are seen by
counsel to be so palpably unsound that they are not urged

upon the attention of the Court. The briefs of the defendant's counsel, also, possess the faults we have mentioned; and, indeed, very many of the briefs filed in this Court are subject to the same censure. The reporter is unable to do counsel justice, when, instead, of copying the points from the brief, he is compelled to surmise the points from the argument. While on this subject, some other matters may be adverted to, by which many briefs might be materially improved. If the facts are stated, they should be stated briefly. The case is more than half argued when the facts are well stated. Neither the points, arguments nor authorities, should be mingled with the statement of facts. When cases are cited, the titles of the cases should be given, and when statutes of this State are cited, the page of the annual statutes should be given, even where a reference is made to a digest.

The plaintiff bases his position, that the selection and the location of the land are two separate acts, upon the language of the eighth section of the Act of Congress of September 4, 1841, the section granting the land to the several States. Both of these terms are employed in the section, and they may not be synonymous. Provision might be made for the selection of the lands; that is to say, the State might indicate in such mode as she saw proper, what lands she desired to acquire in satisfaction of this grant, and provision might be made for their location at a future time, or by other agents. But it seems clear to us, that title to any particular parcel of land does not vest in the State, until the location is made. There is nothing in the Act of Congress, the regulations of the General Land Office, or the statutes of this State, which lends countenance to the idea, that the making by an officer or agent of the State, of a description or list of lands which the State desires to acquire under the Act of Congress, and the filing of the same in any State office, vests the title in the State or a purchaser from the State. But if this were not true, it is unquestionable, that no valid selection can be made of unsurveyed lands.

No special notice is required of the points of the plaintiff, which are based on the assumed validity of the certificate of the Register of the Land Office at Benicia.

The Act of Congress of July 23, 1866, to quiet land titles in California, will not assist the plaintiff in this action, because the right or title, if any, which he acquired by virtue of the Act, did not vest in him until after the commencement of the action.

The certificate of the Register of the Land Office at Stockton, that the land warrant was located on lands in another land district, with the consent of the Register and Receiver of the Land Office of that district, is plainly inadmissible in evidence.

Judgment reversed and cause remanded for a new trial.

WALLACE, J., expressed no opinion.