[In Bank. — January 12, 1883.]

# RETURN ROBERTS, RESPONDENT, *v.* CLEMENTE COLUMBET, APPELLANT.

EJECTMENT — STATE PATENT — SCHOOL LAND LOCATION. — The action was brought to recover land claimed by the plaintiff under a State patent issued in September, 1875, upon an application made in December, 1874. The only defense set up in the answer was a general denial. In October, 1853, the defendant located upon the land a school land warrant issued under an act of the legislature passed on the 3d of May, 1853, to provide for the disposition of the five hundred thousand acres of land donated to the State by the United States. At the time of the location, the land was a part of the public domain of the United States, and had not been surveyed. The survey was made in 1866, and thereupon the State selected certain lands, including the demanded premises, in part satisfaction of the five hundred thousand acre grant. In 1870 the lands so selected were listed to the State by the Commissioner of the General Land Office with the approval of the Secretary of the Interior. *Held,* that the location was valid as between the State and the defendant, that as soon as the land was listed to the State the title passed to the defendant, and that proof of the facts on which the title rested was admissible under a general denial.

APPEAL from a judgment of the late District Court in and for the county of Santa Clara.

*Moore, Laine & Leib,* for Appellant.

*McKisick & Rankin,* for Respondent.

SHARPSTEIN, J. — Ejectment. The plaintiff claims title to the demanded premises under a State patent issued to him September 17, 1875, upon an application made by him December 1, 1874.

The defendant claims under a State five hundred thousand acre land warrant location, made in October, 1853, under an act of the State legislature, approved May 3, 1852, providing for the disposal of the five hundred thousand acres of land donated to the State by the United States.

The land was not surveyed by the United States until 1866, and in 1867 the proper agent of the State selected and located the demanded premises (and other lands), in part satisfaction of the five hundred thousand acre grant made to the State by the act of Congress, which land was listed to the State by the commissioner of the general land office, with the approval of the Secretary of the Interior, in 1870.

If the land in controversy had been surveyed by the United

States prior to the location of the school land warrant under which the defendant claims, it does not seem to us that his title could be seriously questioned. But it is claimed on behalf of respondent that the purchasers of school land warrants from the State were only authorized "to locate the same upon any vacant and unappropriated lands belonging to the United States within the State of California *subject to location*," and that unsurveyed lands of the United States were not "subject to location."

That the act of Congress granting five hundred thousand acres of land to the State did not authorize it to select any land which had not been surveyed by authority of the United States is not controverted. And yet the act of the legislature of May 3, 1852, did provide for the location of school land warrants upon government lands before the same had been surveyed by the United States, and for the issuance of patents, in such manner and form as the legislature might thereafter direct, to those who so located any of said warrants.

As against the United States the locators of school land warrants upon surveyed or unsurveyed lands acquired no rights before the land upon which they located their warrants was listed to the State. The United States dealt with the State only. So that the only question in this case is what, if any, right the appellant acquired to the land in controversy as against the State and those who claim under it by virtue of a location made subsequently to that under which he claims.

The donation by Congress to the State was of five hundred thousand acres of land to be selected from lands of the United States after the same had been surveyed by its authority. Instead of waiting for such survey to be made the State proceeded to select and dispose of lands which had not been so surveyed. By so doing the State undertook to dispose of land to which it had not acquired, but to which it expected to acquire the title from the United States. The only obligation which the State thereby incurred, if any, was to convey to such locators the title to the lands located by them in the event of the same being thereafter listed to the State.

The Act of May 3, 1852, not only provided for the location of school land warrants upon unsurveyed lands of the United States, but provided for the issuance of patents to such locators

after the lands embraced within their locations had been surveyed by the United States. Unless that act contravened some law of the United States it amounted to a contract between the State and any person, who, in accordance with its provisions, located a school land warrant upon any government land before the same had been surveyed. In other words, the State undertook and promised for a sufficient consideration to convey to such locator the land upon which he located his warrant, if the United States should at any time thereafter convey such land to the State. We are unable to discover any reason why the State could not make such a contract. And if it could its contract with a private person must be construed precisely as it would be if both parties were private persons. (*Davis* v. *Gray,* 16 Wall. 203 ; *Hall* v. *Wisconsin,* 13 Otto, 5.)

In the case before us the State, in 1852, sold a school land warrant which, in 1853, was located upon the land sued for in this action. In 1866 said land was surveyed by the United States, and in 1870 listed to the State in part satisfaction of the five hundred thousand acre grant. In 1874 the respondent made application to purchase said land with a school land warrant, and said application was approved by the Surveyor-General, and in pursuance thereof a patent was issued to respondent in 1875. Both purchases were made with school land warrants— one in 1853 and the other in 1874. The first was made in strict conformity with the provisions of a statute of the State then in force. But it is claimed that that statute, so far as it provided for the disposition of any part of the five hundred thousand acre grant before such part had been surveyed by the United States, was void. And this position is supported by the cases of *Hastings* v. *Devlin,* 40 Cal. 358 ; *Hastings* v. *Jackson,* 46 Cal. 243 ; *People* v. *Jackson,* filed June 16, 1881. And although this question was not necessarily involved in *Terry* v. *Megerle,* 24 Cal. 609 ; *Megerle* v. *Ashe,* 27 Cal. 322 ; *Grogan* v. *Knight,* 27 Cal. 516 ; *Smith* v. *Athearn,* 34 Cal. 506 ; *Collins* v. *Bartlett,* 44 Cal. 371 ; or *Churchill* v. *Anderson,* 53 Cal. 212, there are expressions to be found in each of them which indicate that the views of the court were then in harmony with the decision in *Hastings* v. *Jackson, supra.*

But we think this case distinguishable from *Hastings* v. *Dev-*

*lin, supra.* In that case both locations were made prior to the passage of the act of Congress of July 23, 1866, entitled "An act to quiet land titles in California," the first section of which provides "that in all cases where the State of California has heretofore made selections of any portion of the public domain in part satisfaction of any grant made to said State by any act of Congress, and has disposed of the same to purchasers in good faith under her laws, the lands so selected shall be, and hereby are, confirmed to said State."

In that case there had been a *valid* location as well as an *invalid* one made upon the land before the passage of said act. Congress could not and did not attempt to invalidate valid sales made by the State prior to the passage of said act. It simply confirmed to the State lands which had been previously selected by the State and disposed of by it to purchasers in good faith. If a valid selection and sale had been made before the passage of that act, the title of the purchaser in good faith required no confirmation, and could not be affected by any act of Congress or of the State legislature. This is too clear to admit of argument, and illustrates the difference between that case and this. In this case the State made the selection and disposed of the land to the appellant, a purchaser in good faith, before the passage of the act confirming to the State lands so selected and disposed of by it. And it does not appear that at the date of the passage of the act of July 23, 1866, there was any claim to the land adverse to that of the appellant herein. So that the appellant was in a position to reap the full benefit which that act conferred upon purchasers who, prior to the passage of said act, had purchased in good faith of the State lands donated to it by the United States.

The question upon which the decision of the case must turn is whether the appellant is in a position to defend his right of possession as against the respondent in an action of ejectment, under an answer containing nothing more than a general denial. If the legal title to the demanded premises had vested in the appellant before the commencement of the action, he could have shown that fact under the general denial.

The act of Congress to which we have referred characterizes the transaction between the State and the appellant as a disposi-

tion of the land in controversy by the former "under her laws" to the latter. Congress in that act treats the lands to which it refers as *disposed* of by the State, and confirms and ratifies that disposition. Was not that sufficient to vest the legal title in the appellant? At the date of the passage of that act of Congress the title was undoubtedly in the United States. But the State "under her laws" had "disposed of the same" to a purchaser "in good faith," and Congress in effect said to the State, "Inasmuch as you have done this, the United States will confirm said land to you."

The provision of the act of Congress is not so clearly worded as it might have been, but the intention, obviously, was to confirm the disposition which the State had made of lands to purchasers in good faith under the laws. And we must construe it according to the intention of Congress. And thus construed, it doubtless vested in those who had prematurely purchased from the State lands donated to it by the United States, the legal title to such lands.

In the Act of July 23, 1866, Congress starts out with the declaration "that in all cases where the State of California has heretofore made selections of any portion of the public domain in part satisfaction of any grant made to said State by any act of Congress, and has *disposed* of the same *to purchasers in good faith under her laws,* the lands so selected shall be and hereby are confirmed to said State." The intention clearly was to place the purchaser in the same position that he would have occupied if the State, at the time of his purchase, had held the title to the land purchased. And this view is strengthened by a clause in the third section of the act, where such a purchaser is referred to as "the holder of the State title."

Sections 2 and 3 of the act do not in any way qualify the first clause of section 1. The confirmation contained in the first section is not made to depend upon a compliance with any of the provisions of the sections which follow it. The latter simply point out the methods by which the State may have the land listed to it by the Commissioner of the General Land Office. But it is nowhere enacted that neglect or failure to comply with those provisions shall in any way affect the grant contained in the first section.

The case as presented by the record now before us is substantially as follows: By the Act of Congress of September 4, 1841, five hundred thousand acres of land were granted to the State, to be selected "in such manner as the legislature thereof" should direct. And the legislature in the Act of May 3, 1852, directed in what manner such lands should be selected, and the land in controversy was selected and sold to the appellant in strict conformity to the provisions of said last-mentioned act. If the land so selected and sold had been surveyed by the United States, but not listed to the State prior to such selection and sale, could the purchaser in possession under an answer containing a general denial only have availed himself of these facts as a defense in an action of ejectment brought against him for the recovery of the possession of the same land by one who had purchased the same from the State and received a patent therefor, after such land had been listed to the State under a selection made subsequently to that under which the first locator purchased? If the grant by Congress to the State became absolute as soon as the State made a selection in such manner as the legislature directed that it should be made, and the grant by the State became absolute as soon as the locator of the warrant had fully complied with the requirements of the Act of May 3, 1852, it does seem to us that the first purchaser in such a case would become vested with a prior title which he might avail himself of under a general denial in an action of ejectment even against a patent issued to a subsequent purchaser. And since the passage of the Act of July 23, 1866, we think that the position of the appellant has been essentially the same as it would have been if the land upon which he located his warrant had been, before the date of such location, surveyed by the United States.

Judgment reversed, and cause remanded for a new trial.

MORRISON, C. J., THORNTON, J., and MCKINSTRY, J., concurred.

MYRICK, J., McKEE, J., and ROSS, J., dissented.