# CASES

## ARGUED AND DETERMINED

### IN THE

# United States Circuit and District Courts.

---

UNITED STATES *v.* CURTNER *et al.*

(*Circuit Court, N. D. California.* February 4, 1889.)

1. PUBLIC LANDS—GRANT TO RAILROAD COMPANY.
   The congressional acts of 1862 and 1864 granting aid in the construction of a railroad and telegraph line to the Pacific ocean, etc., operated as a present grant of land to the railroad company, upon conditions subsequent, which could only be defeated by breach of conditions, and divestiture of title thereupon, by proper legal proceedings on behalf of the United States.

2. SAME—LANDS GRANTED.
   The lands granted were the odd-numbered sections within 20 miles of the line of the road, such as were public lands at the date of the act, not sold, reserved, or otherwise disposed of by the United States; and such odd-numbered sections within the same limits as were public lands, to which a pre-emption or homestead claim had not attached at the time the line of the road was definitely fixed.

3. SAME—CONCLUSIVENESS OF GRANT.
   No right other than that of the railroad company could be acquired or initiated in any of said odd sections of land, after the filing in the local land-office of the district, on January 30, 1865, of the order of withdrawal provided for in section 7 of the act of July 1, 1862.

4. SAME—FILING MAP OF ROUTE.
   The filing of the map of the general route and the withdrawal thereupon protected the lands against the acquisition of any right by any other parties until the line should become "definitely fixed," when the grant became specific by attaching itself to every odd section within the prescribed limits.

5. SAME—STATE SELECTIONS OF LIEU LANDS.
   State selections of lieu lands for school purposes made upon lands unsurveyed by the United States are utterly void.

6. SAME.
   All the state selections shown in the bill being upon lands unsurveyed by the United States at the date of selection, in townships 2 S., 1 E., and 3 S., 3 E., Mt. Diablo B. and M., were therefore void.

7. SAME—WHAT ARE SURVEYED LANDS.
   Lands are not surveyed lands by the United States until a certified copy of the official plat of survey has been filed in the local land-office.

v.38F.no.1—1

**8. SAME—STATE SELECTIONS—VALIDITY.**

The state selections in question were also void, for the reason that the act of 1853, under which these selections were made, excepted from selection by the state in lieu of school sections lost, "lands reserved by competent authority" and "lands claimed under any foreign grant or title," and "mineral lands."

**9. SAME—PRIORITY OF GRANT.**

No right of any kind had attached to these lands when they were withdrawn for the purposes of the railroad grant on January 30, 1865, that, under the recent decision of the United States supreme court, in *U. S.* v. *McLaughlin,* 8 Sup. Ct. Rep. 1177, could prevent that grant from attaching. It was, therefore, the first grant to attach, and by performance of the conditions subsequent the title of the company became absolute.

**10. SAME—LANDS EXCEPTED FROM CONFIRMATION.**

The selections in question were excepted from confirmation by the act of 1866, (14 St. 218;) but had it been otherwise, it was not in the power of congress at that time to divest the right of the company.

**11. SAME—CONFIRMATORY ACT OF MARCH 1, 1877—EFFECT.**

The act of March 1, 1877, (19 St. 267,) for like reasons, cannot affect the rights of the railroad company. At the date of this confirmatory act, seven years after the title of this company became perfect, the United States had no interest whatever in the land upon which the act could operate.

**12. SAME—SALE TO THIRD PERSONS—NOTICE.**

Parties purchasing under state locations in township 2 S., 1 E., since June 10, 1865, had official record notice of the right of the railroad company; for the map filed in the office of the register of the local land-office had distinctly indorsed upon it in red ink the following, viz.: "The odd-numbered sections on this plat are granted to the Western Pacific Railroad."

**13. LIMITATION OF ACTIONS—RUNNING OF THE STATUTE.**

The statute of limitations does not run against the United States; and the cause of action here was not stale, the company having been, from the first, active in pursuing its right before the department of the interior.

**14. UNITED STATES—CONTRACTS RELATING TO PUBLIC LANDS—ACTIONS.**

The government is not without interest in this action, being responsible to the company for the land or its full value, by reason of the statutory grant and contract in the congressional acts of 1862 and 1864.

**15. PUBLIC LANDS—MEXICAN GRANT.**

The Mexican grant called "Las Pocitas," was a float,—a grant of two leagues within exterior boundaries embracing ten or more leagues, which two leagues so granted were confirmed and patented to the claimants, and the odd-numbered sections outside of the two leagues granted and confirmed, but inside of the exterior boundaries, passed to the railroad company.

**16. SAME.**

The prior decision, in *Newhall* v. *Sanger,* 92 U. S. 761, by the United States supreme court, materially limited in its operation by the recent decision in *U. S.* v. *McLaughlin.*

*(Syllabus by the Court.)*

In Equity.

*Benjamin Harris Brewster,* Atty. Gen., *S. G. Hilborn,* U. S. Dist. Atty., *Shafter, Parker & Waterman,* and *J. W. Harding,* for the United States.

*H. F. Crane, Mich. Mullany, L. D. Latimer, Thos. D. Carneal, Rothschild & Baum,* and *J. C. Martin,* for respondents.

Before FIELD, Justice, and SAWYER, Circuit Judge.

SAWYER, J., (FIELD, Justice, *concurring.*) This is a bill in equity, filed by the attorney general on behalf of the United States, at the request of the secretary of the interior, to obtain a decree of the court vacating and annulling the listing over to the state of certain lands selected

by the state, in lieu of sections 16 and 36, as was supposed, in pursuance of the act of congress on the subject, adjudging such listing to be unauthorized and void, annulling and vacating the patents issued to purchasers by the state, after such selecting and listing, and decreeing that no title to the lands passed thereby to the patentees. The grounds of the bill are, that the listing over to the state was by mistake and without authority of law; the lands having been granted to the Central Pacific Railroad Company before any right could have attached in favor of the state, and were therefore, not subject to selection by the state under the said acts. After a contest continued for many years, the secretary of the interior has finally decided that the lands in question belong to the railroad company, and that it is entitled to a patent, that they were listed to the state by mistake, without authority of law, and that the listing is void. But the department refuses to complicate matters by issuing patents. According to the view of the secretary of the interior, the United States are under obligation to convey a clear title to the railroad company, and they are unable to do so by reason of the mistake of the officers of the government, in unlawfully listing the lands to the state; and, consequently, that it is the duty of the government to have the prior listing to the state annulled, and the patents issued thereon declared to be unauthorized and void by a decree of the court, before issuing patents to the party entitled. For these reasons, and upon these grounds, this bill has been filed by the attorney general, at the request of the secretary of the interior.

The lands in question are odd sections, lying within the 20-mile limit of the grant of lands made to the Central Pacific Railroad Company, to aid in the construction of its road, by the act of congress of July 1, 1862, and the act of 1864 amending said act. 12 St. p. 492, § 3; 13 St. p. 358, § 4. Part of the lands lie in township 3 S., range 3 E., Mt. Diablo Base and Meridian, and a part in township 2 S., range 1 E. The lands in township 3, range 3, were surveyed in the field in August, 1862, and sectionized, and a plat thereof was made and approved by the surveyor general of California, December 24, 1862, but a duly-certified copy of the plat was not filed in the land-office of the district till June 4, 1869. The certified copy of the plat then filed is regarded by the department as the official plat, and the date of its filing, June 4, 1869, as the date of the survey. On December 28, 1865, a plat of the township, approved by the surveyor general December 18, 1865, was filed in the district land-office, but this plat is not regarded by the department as official, or as indicating the date of the official survey. Township 2 S., range 1 E., was first surveyed in the field in March, 1865, and an approved plat thereof first filed in the district land-office June 10, 1865. In accordance with the provisions of said acts of 1862 and 1864, the railroad company filed in the department of the interior, on December 8, 1864, its map designating the general route of the road, and on December 23, 1864, the secretary of the interior, in pursuance of the provisions of said acts, issued an order withdrawing the said lands for the distance of 25 miles on each side of the line of said road so designated, "from sale,

location, pre-emption and homestead." A, map, showing distinctly the lands so withdrawn, accompanied said order. Said order of withdrawal and map were received and filed in the district land-office, and went into effect, at latest, on January 30, 1865. This action was before any of the lands in township 2, range 1, had been surveyed in the field, and before any plat recognized by the department as official, of the lands surveyed in township 3, range 3, had been filed, but after this latter township had been actually surveyed in the field. The road having been fully completed and accepted by the president, the railroad company filed its map of definite location on February 1, 1870. In 1839 the Mexican governor, Alvarado, made a grant of land called "Las Pocitas," to one Livermore and another, who presented it to the board of land commissioners for confirmation, and it was confirmed by the board, February 14, 1854. The decree is in the words following, to-wit:

"The lands of which confirmation are hereby made of 'Las Pocitas,' are bounded and described as follows, to-wit: On the north by the Lomas de las Cuevas; on the east by the Sierra de Buenos Ayres; on the south by the dividing line of the establishment of San Jose; and on the west by the rancho of Don Jose Dolores Pacheco, containing in all two square leagues, a little more or less. Reference for further description to be had to the map marked 'C,' and filed in the cause."

The exterior boundaries contained from 10 to 12 leagues. The district court, on appeal, affirmed the decree of the board, February 18, 1859, and the supreme court of the United States finally confirmed the grant on appeal in January, 1861.[1] The final decree of confirmation is in the words following:

"The land of which confirmation is hereby made is known as 'Las Pocitas,' and is bounded and described as follows, to-wit: On the north by the Lomas de las Cuevas; on the east by the Sierra de Buenos Ayres; on the south by the dividing line of the establishment of San Jose; and on the west by the rancho of Don Jose Dolores Pacheco, containing in all two square leagues, provided that quantity be contained within the boundaries named, and if less than that quantity be contained therein, then the less quantity is hereby confirmed. Reference for further description to be had to the map marked 'C,' filed in this case."

After confirmation by the board, and before the appeal, at the request of Livermore, then the owner of the grant, on April 5, 1854, William J. Lewis, a deputy-surveyor, was directed by the United States surveyor general of California to make a survey. He was directed to notify any adjoining claimants who might·be interested, of the time and place when any line would be run; to note any objections, and report any protest that might be made. He made the survey in accordance with the instructions, Livermore being present, and pointing out his corners and boundaries; and the deputy-surveyor reported that the owner, Livermore, "expressed himself entirely satisfied with the boundaries as I surveyed them, and as represented in the accompanying map." He reports that he has no doubt that "the survey as made fulfills the intentions of the Mexican grant, as derived from the terms of the grant." The neigh-

---

[1] Not reported.

boring owners were notified, and were also present with Livermore, and pointed out their boundaries; and they, as well as Livermore, were satisfied. This survey was approved by the surveyor general June 19, 1854. It embraced over four—nearly five—square leagues of land, more than double the amount afterwards stated in the decree of confirmation by the supreme court, but did not include any of the lands now in controversy. An appeal having afterwards been taken by the United States from the decree of confirmation, nothing further was done under this survey. The final decree of confirmation by the supreme court in January, 1861, limited the amount to two square leagues, by striking out the words "more or less," in the decree of the board, and adding other words indicating the purpose; the language of the final decree being "containing in all two square leagues, provided that quantity is contained within the boundaries named," etc. In 1858, pending the appeal, Livermore died. The claim having been finally confirmed in 1861, Mr. Dyer, a deputy-surveyor, in 1865, under instructions dated September 21, 1865, made a survey, which embraced ten square leagues instead of two, to which the quantity was limited by the terms of the final decree. This survey embraced the entire Lewis survey, and extended far beyond it, in nearly all directions, and especially to the south-east and north-west. It also embraced the lands in controversy in this suit, at the two extremities of the survey, in the longest direction of the survey. The survey was approved by the surveyor general of California on February 8, 1867. On July 30, 1868, the secretary of the interior set aside this survey as being "clearly wrong," and directed the commissioner to return it to the "surveyor general, with instructions to reduce the quantity of land to two square leagues." A new survey was made by Dyer, deputy-surveyor, by which the land was reduced to two square leagues, all of which lies within the boundaries of the Lewis survey, but does not cover one-half of that survey. None of the lands in controversy are within the two square leagues, or even within the boundaries of the Lewis survey. This last survey of two square leagues was approved by the surveyor general May 11, 1870, by the commissioners of the general land-office, March 1, 1871, and by the acting secretary of the interior on June 6, 1871, by which it became final. The land was patented in accordance with this survey, and the patent accepted by the claimant. Between May 15, 1863, and May 16, 1864, after actual survey in the field, but before the survey had been officially adopted or recognized by the secretary of the interior, and before it had been approved by the surveyor general, and filed in the district land-office, the state of California, by its locating agent, made selections and locations of all the lands now in controversy in township 3, range 3, in part satisfaction of the grant to the state, of lands in lieu of sections 16 and 36, under the act of March 3, 1853, (10 St. p. 246, §§ 6, 7.) Between February 17, 1864, and February 9, 1866, the state had issued its certificates of purchase to the several purchasers thereof, the first payments of the purchase money having been made. The selections, apparently, at their respective dates were by the register of the land-office entered in his of-

fice; A portion of these lands was certified over to the state by the land department at Washington, approved by the secretary of the interior on November 15, 1871, and the remainder on March 24, 1873, and they were afterwards patented to the purchasers by the state.

The lands in controversy situate in said township 2, range 1, were selected in advance of any survey in the field by the United States surveyor general, upon surveys made by the county surveyors of the state, between July 28, 1862, and July 20, 1863. Certificates of sale were issued to purchasers by the state for a part between March 2, 1863, and January 25, 1864, and for the remainder, between February 20, and March 14, 1865. These selections were entered by the register of the land-office on June 12, 1865. A part was certified over to the state by the secretary of the interior on September 8, 1870, and the rest on March 11, 1871. These lands were also afterwards patented to the purchasers by the state. The listings over to the state were all after the final approval of the two square league survey of the Rancho Las Pocitas, which was on June 6, 1871; also after the filing of the map of general route of the road by the railroad company in December, 1864, and the withdrawal by the secretary of the interior in January, 1865; as well as after the filing of the map of the definite location of the Western Pacific Railroad Company, on February 1, 1870. But the surveys and selections and issue of certificates of purchase by the state were before the said dates of June 6, 1871, and February 1, 1870. The Western Pacific Railroad was completed in accordance with the terms of the several acts of congress relating to the subject, on or before December 29, 1869, and the company thereby became entitled to the lands granted. A contest thereupon immediately arose before the department of the interior, between the railroad company and the settlers who settled subsequently to the grants on the odd sections, as to what lands were included by the grant, and this was supposed to depend upon the exterior boundaries of the Las Pocitas grant. This matter was earnestly litigated before the department, a test case, (*Arthur St. Clair* v. *The Western Pacific Railroad Company,*) having been made by stipulation with the settlers, until January, 1874, when it was decided in favor of the railroad company. Soon thereafter, on May 12, 1874, the land agent of the company presented a list of lands for which the company claimed patents, including the lands in controversy, when it was discovered that the latter had been listed over to the state by mistake, upon the state selections hereinbefore referred to, as indemnity lands for losses of sections 16 and 36 granted for school purposes, and that they were claimed by purchasers from the state. The claim of the company for patents to these lands was vigorously prosecuted by the company, with varying results; until it was finally determined by the secretary of the interior, upon petition for reconsideration by the company, filed April 22, 1880, that the company was entitled to the lands; but he declined to complicate matters by issuing patents until the question of right should be settled by the courts. Thereupon, and for the purpose of having the question authoritatively adjudicated, upon his request the bill in this

case was filed by the attorney general on July 23, 1883. Upon the allegations of the bill, a demurrer was interposed, on the ground, among others, that the cause of action was barred by the statute of limitations; and if the statute of limitations does not run against the United States, then that the cause of action is stale, and it would be inequitable to enforce it at this late day. The demurrer was overruled, since the statute does not run against the United States, and the railroad company had, from the first, been active in pursuing its right before the department. The delay was entirely owing to the course of procedure in the department, and the large amount of other similar business incident to the administration of its affairs. *U. S.* v. *Curtner,* 11 Sawy. 411, 26 Fed. Rep. 296. Since the decision on the demurrer, the supreme court has decided the case of *U. S.* v. *Beebe,* 127 U. S. 338, 8 Sup. Ct. Rep. 1086, in which it is held that, after a lapse of 45 years, a suit in the name of the United States to cancel a patent obtained by fraud, and in which the United States has no interest, is barred—the suit being affected by the laches of those whose interests it asserts. The point is, therefore, now again made at the hearing, and this case is relied on as determining the question. We do not think it reaches the case. There has, certainly, been no laches here on the part of the railroad company. It has been pressing its claim earnestly before the department from the first, and it could not go any faster than the business and course of procedure of the department permitted. The company could not sue the government. Besides, we do not think the government is wholly without interest. If these lands are within the statutory grant, the company has earned them by a full performance of its part of the statutory contract, and an absolute indefeasible right to a patent, unincumbered by any cloud, has vested. The government, in that case, is legally bound to make a good title. It is legally liable to perform its part of the contract, and issue the patent as required by the statute. The United States are, therefore, responsible to the railroad company for the land, or its full value. By the mistake of their officers, they have put it out of their power to comply with their contract; and they are interested to the full value of the land in setting aside the listing and patents resulting from their mistakes, or having them judicially adjudged inoperative and void, in order that they may relieve themselves from their liability. For these reasons, we do not think the decision relied on reaches the case.

As we have seen from the facts stated, the lands in question are odd sections within the limits prescribed by the act of 1862, granting lands to aid the construction of the Western Pacific Railroad. The Mexican grant called "Las Pocitas" was a float—a grant of two leagues within exterior boundaries embracing ten or more leagues, unlocated both at the date of the act of 1862, and at the times when the claims of the state to the land in question were initiated. After the rights of both parties, whatever they were, had attached, this grant was finally located and patented so as to exclude the lands in controversy. There was then ample land other than these lands to satisfy this float, both at the time of the passage of the act of 1862, and at the time when the right of the railroad

company attached to the particular odd sections, and became specific and indefeasible. In *U. S.* v. *McLaughlin,* 127 U. S. 428, 8 Sup. Ct. Rep. 1177, (decided at the last term of the supreme court,) it was held, after the most mature consideration, that, in case of a floating Mexican grant of a specific quantity of land within large exterior bounds, the lands within such exterior boundaries are public lands, subject to a railroad grant, there being sufficient left to satisfy the float; and that the said act of 1862 took effect upon the odd sections of land within such exterior boundaries as were not finally required to satisfy the float; thus very materially limiting the operation of the prior decision in *Newhall* v. *Sanger.* That is precisely this case; and the same act of 1862 granted to the same company all the odd sections within the exterior boundaries of the Las Pocitas grant, embracing ten or more leagues within the prescribed limits and conditions not required to satisfy the float of two leagues, which has since been finally located so as to exclude the lands in question. Under this decision, then, the railroad company, by the acts of 1862 and 1864, had a valid grant to every odd section of land within twenty miles on each side of the road, and within the exterior bounds of the Las Pocitas grant, not embraced within the two leagues as it was finally located, "not sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim may not have attached at the time the line of said road is definitely fixed." 12 St. 492, § 3. The lands in question are odd sections within the prescribed limits, and are not embraced in the Las Pocitas grant as finally patented. These lands, therefore, upon completion of the road, passed to the railroad company, unless some one of the rights specified in the statute had attached before the attaching of the right of the company. Section 7 of the act provides that the "said company shall designate the general route of said road, as near as may be, and shall file a map of the same in the department of the interior, whereupon the secretary of the interior shall cause the lands within fifteen miles of said designated route or routes to be withdrawn from pre-emption, private entry, or sale." Id. 493. This map of general location was filed in the office of the secretary of the interior on December 8, 1864, and on December 23, 1864, the secretary issued an order in pursuance of the acts of congress, as they then were, withdrawing for 25 miles on each side of the designated line "from sale, location, pre-emption and homestead," and forwarded it, together with a map showing the location and lands withdrawn, to the register of the land-office of the district embracing the lands where it was received, filed and promulgated on January 30, 1865; from which date at the latest, no right other than that of the railroad company, could be acquired or initiated in any of said odd sections of land. If, then, no right of the kind specified by the statute had legally attached to the lands in question before the 30th of January, 1865, none could thereafter attach in favor of the state by selection, listing over by the land department, or otherwise, nor could congress even authorize any subsequent legal transfer of title. The grant to the railroad company was a present grant upon conditions subsequent, which could only be defeated by breach of con-

dition and its divestiture of title thereupon, by proper legal proceedings on behalf of the United States. The filing of the map of the general route, and withdrawal thereupon from sale, pre-emption, etc., protected the lands against the acquisition of any other right by any other parties until the line should become "definitely fixed," when the grant would become specific by attaching itself to every odd section within the prescribed limits, and could not thereafter be changed. *U. S.* v. *McLaughlin,* 12 Sawy. 191, 202, 30 Fed. Rep. 147; *Buttz* v. *Railroad Co.,* 119 U. S. 55, 7 Sup. Ct. Rep. 100; *Railroad Co.* v. *Orton,* 6 Sawy. 198, and cases there cited; *Denny* v. *Dodson,* 32 Fed. Rep. 899; *Schulenberg* v. *Harriman,* 21 Wall. 44; *Railway Co.* v. *Railroad Co.,* 97 U. S. 491.

The only remaining question, therefore, is: Had any such right, as is excepted by the statute, legally attached in favor of the state in the lands in question, or any of them, on January 30, 1865? It is not pretended that any other right than that under the state selection had attached. It has been settled by numerous decisions in the state of California, and affirmed by the United States supreme court, that the state could acquire no right whatever by a selection of lieu lands made before the lands have been surveyed by the United States; and that a selection made upon unsurveyed lands is utterly void. *Grogan* v. *Knight,* 27 Cal. 516; *Railroad Co.* v. *Robinson,* 49 Cal. 446, 448; *Chant* v. *Reynolds,* Id. 217; *Young* v. *Shinn,* 48 Cal. 26; *Hastings* v. *Devlin,* 40 Cal. 358; *Toland* v. *Mandell,* 38 Cal. 31, 41; *Aurrecoechea* v. *Sinclair,* 60 Cal. 549; *Collins* v. *Bartlett,* 44 Cal. 371, 380; *Smith* v. *Athern,* 34 Cal. 506; *Aurrecoechea* v. *Bangs,* 114 U. S. 383, 5 Sup. Ct. Rep. 892; *Barnard's Heirs* v. *Ashley's Heirs,* 18 How. 46. None of the lands in question situate in township 2 S., range 1 E., as we have seen, were surveyed in the field by authority of the United States till the month of March, 1865, and the approved plats were not filed in the district land-office till June 10, 1865. The applications of the state locating agent to locate all said lands in township 2 S. were made and entered in the office of the register of the land-office on the 12th and 13th of June, 1865; the register having refused to recognize applications made in 1862 and 1863 upon surveys made under authority of the state. As we have seen, the acts of the state in making selections prior to the United States survey in March, 1865; and the filing of the plat in the land-office in June, were utterly void, and no rights attached to the lands or any of them by virtue of those acts performed before said survey in March. On January 30th, at latest, the grant to the railroad company attached in such manner that it could not be thereafter limited or divested; and the absolute right to the lands by the completion of the road and filing the map of definite location indefeasibly vested in the company. There can be no doubt, therefore, that the complainants should have a decree that they are entitled to the lands in said township 2 S. The lands in question lying in township 3 S., stand in no different situation from those in township 2 S., except that they were surveyed in the field by the United States deputy-surveyor in August, 1862, and a plat thereof was made and approved by the surveyor general on December 24, 1862; but a certified

copy was not filed in the office of the register of the land-office of the district embracing the lands until June 4, 1869. This plat (so filed in 1869) is regarded by the interior department as official, and the survey as made of the date of filing. A plat approved by the surveyor general December 18, 1865, however, was filed in the district land-office on December 28, 1865, this being the first plat filed in that office; but this map is not regarded by the interior department as official, as it had not at that time been approved and adopted by the department. Were it otherwise, this filing was too late. Unless the actual survey in the field, and making and approving a plat by the surveyor general without filing it, or a certified copy of it, in the local land-office, places the lands in the category of surveyed lands in contemplation of law, then these lands were also selected before they were surveyed by the United States, and the selections were void. The interior department did not regard the survey as official until the certified copy of the official plat was filed by direction of the department in the local land-office, June 4, 1869. Whether this is to be regarded as the date of the survey or not, we are satisfied that the lands could not be regarded as legally surveyed in such sense as to open them to selection, location, sale, or other disposition till the approved copy of the plat was filed on December 28, 1865. This is the earliest date at which they could be considered open to selection, if open to selection then. The land-office was the place for the disposition and record of the public lands; and until they had an authentic official plat of the surveys of the public land, it would be impracticable to keep a record of them or of their disposition. If we are correct in this view, then no valid selection could be made, at the earliest, till December 28, 1865, and this was several months after the grant to the railroad company had indefeasibly attached.

On another ground the state selections in question are clearly void, and no interest attached to the lands selected in favor of the state. By the express terms of the act of 1853, under which the selections were made, "lands reserved by competent authority," "lands claimed under any foreign grant, or title, and the mineral lands," are excepted from the operation of the act. Consequently, neither such "reserved lands," lands claimed under Mexican grants, nor mineral lands could be legally selected in lieu of school sections lost, or otherwise disposed of. And this was manifestly the view of congress, for when it passed the act of 1866, to quiet titles in California by confirming void selections, it also expressly excepted from confirmation "any land held or claimed under any valid Mexican or Spanish grant." 14 St. p. 218, § 1. That selections of lands so claimed under Spanish grants were void, and created no right whatever in the state, is directly decided and settled by the supreme court of the United States in cases arising under this very grant, Las Pocitas, upon locations made in 1863, at the same time and in the same manner as the lands now in question were selected and located. *Aurrecoechea* v. *Bangs*, 114 U. S. 382, 5 Sup. Ct. Rep. 892, and *Huff* v. *Doyle*, 93 U. S. 558. These cases are controlling. The lands were claimed under the Las Pocitas grant, at the time of their selection, location and

sale by the state, and they were afterwards in fact included in one of the surveys upon the final decree of confirmation; but that survey was set aside, and they were finally excluded by the survey which became final in the year 1871. The supreme court held that no valid selection could be made by the state until the grant was finally located. No right of any kind then had attached to these lands when they were withdrawn for the purposes of the railroad grant on January 30, 1865, that under the recent decision of the supreme court in *U. S.* v. *McLaughlin,* could prevent that grant from attaching. It was, therefore, the first grant to attach, and, by performance of the conditions subsequent, the title of the company became absolute. The selections in question were excepted from confirmation by the act of 1866; but had it been otherwise, as we have seen, it was not in the power of congress at that time to divest the right of the company. The act of March 1, 1877, (19 St. 267,) for like reasons, cannot affect the rights of the railroad company. The right of the company had not only attached, but by the performance of the required conditions within the prescribed time, and of the filing of the map of definite location, the grant had become specific on February 1, 1870, and the title of the company had become absolute and indefeasible. At the date of this confirmatory act, therefore, seven years afterwards, the United States had no interest whatever in the land upon which the act could operate.

This case affords another instance of hardship arising from the ill-advised efforts of the state to prematurely select the lands to which it was entitled, without regard to the existing laws of the United States. But with respect to the particular lands now in question, the parties purchasing in township 2 S., 1 E., since June 10, 1865, had official record notice of the right of the railroad company, for the map filed in the office of the register of the land-office had distinctly indorsed upon it, in red ink, the following: "The odd-numbered sections on this plat are granted to the Western Pacific Railroad. See letter of instructions dated December 23, 1864." It follows from these views that there must be a decree in favor of the United States, adjudging that the listing to the state of the lands in controversy was unauthorized and void, and that the patents issued by the state upon such listing to purchasers from her passed no title to them in the lands patented, and enjoining them from claiming, in any way or form, title to such lands, or to any part of them, under the said patents, and that the title to the lands passed to the Central Pacific Railroad Company by the acts of congress of July 1, 1862, and of July 2, 1864, the said company having complied with the conditions of the grant to it, and constructed the road and telegraph line designated therein; and that the said company is entitled to a patent of the United States for such lands. No costs will be allowed to the complainants.