## WILLIAM H. KNOWLES v. JAMES H. YEATES.

APPEAL IN CONTESTED ELECTION CASES.—The Constitution gives the Supreme Court jurisdiction on appeal from judgments rendered in contested election cases in the County Courts.

CASE AFFIRMED.—*Conant* v. *Conant,* 10 Cal. 252, affirmed.

CONTEMPORANEOUS EXPOSITION OF A PROVISION OF THE CONSTITUTION.—Judicial interpretation of the meaning and effect of a provision of the Constitution, made near the time of its adoption, is strong evidence that the people in adopting it understood and intended it to be as interpreted.

INTERPRETATION OF A LAW.—The reason and intention of the lawgiver will control the strict letter of the law in interpreting the same, when to adhere to the strict letter would lead to palpable injustice, contradiction or absurdity.

MALCONDUCT OF OFFICERS OF ELECTION.—If the persons acting as the Inspector and Judges of an election open the polls and hold the election at a place far distant from that appointed by the Board of Supervisors for holding the election, it amounts to malconduct in the sense of the statute concerning elections.

ADHERENCE TO ELECTION LAWS.—Courts should so far adhere to the substantial requirements of the law in relation to elections as to preserve them from abuses subversive of the inherent and constitutional rights of the people.

ELECTION MUST BE HELD AT PLACE APPOINTED.—If the Inspector and Judges of an election open the polls and hold the same at a place not authorized by the Board of Supervisors, and at a distance from the place appointed by the Board of Supervisors for holding the same, without any excuse therefor, the election is invalid, and the votes there cast should be rejected and disallowed.

APPEAL from the County Court, Plumas County.

The facts are stated in the opinion of the Court.

*Van Clief & Gear,* for Appellant, argued that admitting the votes contested were actually cast by qualified electors, and that there was no fraud, still the elections held at the Buckeye House, six miles from Granite Basin, the place appointed, and at the Warehouse, three miles from Cascade,

the place appointed, and at McPike's, a mile from Grizzly Valley, the place appointed, were invalid, and that all the votes cast at those precincts should be rejected. They argued that the validity of an election depended on the law, and that when a law fixed the time and place for holding an election, time and place were of the substance of the election and could not be dispensed with; and cited *People* v. *Ryder*, 12 N. Y. 439; *People* v. *Church*, 6 Cal. 78; *McCune* v. *Weller*, 11 Cal. 61. They argued that in *Whipley* v. *McCune*, 12 Cal. 362, the complaint admitted that the votes were cast at the proper place appointed, but relied on irregularities in the conduct of the officers, and that in *Bourland* v. *Hildreth*, 26 Cal. 214, the votes cast at Phœnix Reservoir were admitted to have been cast at the proper place. They admitted that if the election was held at the place appointed and at the time designated and there was no fraud, that the votes would not be rejected; but contended that the case at bar was to be distinguished from all those cases where Courts had refused to set aside elections without proof of fraud, in this, that in this case the elections had not been held in accordance with any law, because not held at the place appointed; and cited *Ellis* v. *County Com.*, 2 Gray, 376. They also argued that a vote not cast at the proper time and place was as illegal as one not cast by the proper person.

*Creed Haymond*, and *John D. Goodwin*, for Respondent, argued that the Supreme Court had no jurisdiction of the appeal in this case, and that the Act of 1850, giving an appeal, conflicted with the fourteenth section of Article VI of the Constitution, and that the case was not one arising in the Probate Court, nor a case in equity, nor one of the enumerated cases at law. They also argued that the manner in which the elections were held and the places where held, did not amount to malconduct on the part of the Board of Election. They admitted that place was of the substance of an election, but only to the extent that the polls should be opened in the place or precinct where the elector claimed his vote, and argued

that if the election was held by the proper officers and on the designated day, and at a place or precinct where the elector claimed his vote, although not at the particular house designated by the Board of Supervisors, and there was no fraud, the election was not invalid. They also argued that the order of the Board of Supervisors so far as it fixed a place where an election should be held in a precinct, was merely directory; and cited *Holland* v. *Osgood*, 8 Vt.; *Corliss* v. *Corliss*, 8 Id. 290; *Pond* v. *Negas*, 3 Mass. 230; *People* v. *Cook*, 14 Barb. 294; 4 Cowen, 297; 8 Id. 102; 20 Wend. 14; 3 Hill, 42; 5 Denio, 409; and 20 Pick. 484.

By the Court, CURREY, C. J.:

At the general election held in Plumas County on the 6th of September, 1865, Stephen J. Clark and James H. Yeates were candidates for the office of Sheriff of said county. The Board of Canvassers of the county held and declared Yeates duly elected to said office by a majority of five votes. Thereafter, on the 21st of October, William H. Knowles, an elector of the same county, presented to the County Court his petition contesting the election of Yeates and praying that Clark might be declared elected and entitled to the office. Yeates, the respondent, appeared, and answered the petition of Knowles, the contestant. Upon the trial of the issues joined between the parties, the Court rendered judgment for respondent, from which the contestant has appealed to this Court.

The respondent's counsel has made an objection challenging the jurisdiction of this Court in the premises, which it is necessary to consider and dispose of before we can look into the merits of the controversy. The question is one of great importance, and were we without authority on the subject, we should view it as exceedingly embarrassing. In *Conant* v. *Conant*, 10 Cal. 252, which was an action of divorce, an objection was taken that the Supreme Court had no appellate jurisdiction under the Constitution in the case—no question of property being involved in its determination. The fourth

section of the Sixth Article of the Constitution then in force declared that " the Supreme Court shall have appellate jurisdiction in all cases where the matter in dispute exceeds two hundred dollars ; where the legality of any tax, toll or impost, or municipal fine is in question ; and in all criminal cases amounting to felony, on questions of law alone." After referring to the portion of the Constitution quoted, the Court, by Mr. Justice Field, said : " We do not understand the last words of the first clause of this section as restricting the jurisdiction only to those cases which involve questions of property, or the legality of a tax, toll, impost or municipal fine. As we read the section, the Court possesses appellate jurisdiction in all cases ; provided that when the subject of litigation is capable of pecuniary compensation, the matter in dispute must exceed in value or amount two hundred dollars, unless a question of the legality of a tax, toll, impost or municipal fine is drawn in question. * * * It never could have been the intention of the framers of the Constitution to deny to the higher Courts, both original and appellate, any jurisdiction in that large class of cases where the relief sought is not susceptible of pecuniary estimation. * * * We think the construction contended for too narrow, and not imperatively required by the Constitution."

### Appellate jurisdiction of the Supreme Court.

The fourth section of the Sixth Article of the Constitution, as amended, reads as follows : " The Supreme Court shall have appellate jurisdiction in all cases in equity ; also, in all cases at law which involve the title or possession of real estate, or the legality of any tax, impost, assessment, toll, or municipal fine, or in which the demand, exclusive of interest, or the value of the property in controversy, amounts to three hundred dollars ; also, in all cases arising in Probate Courts ; and also in all criminal cases amounting to felony on questions of law alone."

On the part of the respondent it is insisted that this section as amended is a more distinct and exact limitation of the

appellate powers of the Supreme Court than was the section as it stood in the old Constitution, and that the general words, "all cases at law," are limited and restrained by the particular words following in the same clause. We are of opinion, however, that as to the point under consideration these corresponding sections of the old and new Constitutions, are substantially the same, so that the opinion and judgment in *Conant* v. *Conant* may be regarded to be quite as applicable to the case before us as it would have been had the Constitution in the particular noticed remained unchanged.

The learned Judge, in the case referred to, seems to have had in mind the rules of interpretation defined by Rutherforth, as rational and mixed. Rational interpretation is when the words of an instrument do not express the author's intention perfectly, but either exceed or fall short of it, so that the intention is to be collected from probable or rational conjectures only; and mixed interpretation, that is, an interpretation partly literal and partly rational, is when the author's words, though they do express his intention when rightly understood, are in themselves of doubtful meaning, rendering it necessary to have recourse to the like conjectures to find out in what sense the words were used; in which case the intention is collected from the words, but not without the help of other conjectures. (Rutherforth's Institutes, B. 2, Ch. 7, Sec. 3.) By means of these rules of interpretation the spirit of the text is saved from sacrifice to its strict letter. When the provisions of a statute or of the organic law are clear and precise, and attended with no difficulty in the application, there is no room for any interpretation or comment. The intention of the lawgiver is what must be adhered to. But if the language of the instrument is indeterminate, vague or susceptible of a more or less extensive sense, we must presume the intention according to the laws of reason and equity; and for this purpose it is necessary to pay attention to the nature of the things to which the question relates. In this connection Vattel says: "There are certain things of which equity admits the extension rather than the restriction; that is to say, that

the precise point of the will not being discovered in the expressions of the law or contract, it is safer and more consistent with equity to suppose and fix that point in the more extensive than in the more limited sense of the terms." (Vattel, B. 2, Ch. 17, Sec. 300.) Kent says: "It is an established rule in the exposition of statutes that the intention of the lawgiver is to be deduced from a view of the whole and of every part of a statute, taken and compared together. The real intention, when accurately ascertained, will always prevail over the literal sense of terms. When the expression in a statute is special or particular, but the reason is general, the expression shall be deemed general;" and he holds that the reason and intention of the lawgiver will control the strict letter of the law when the letter would lead to palpable injustice, contradiction and absurdity. (1 Kent's Com. 461, 462.). These authorities apply as fully to the interpretation and construction of Constitutions as to contracts, treaties and legislative enactments.

The Constitution of this State was created and adopted by a free people in order to secure to themselves and their posterity the blessings of liberty. In the declaration of rights the great fundamental truths that " all men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty ; acquiring, possessing and protecting property ; and pursuing and obtaining safety and happiness," are distinctly announced ; and it is declared that all political power is inherent in the people ; that government is instituted for the protection, security and benefit of the people, and that no person shall be deprived of life, liberty or property without due process of law. The Constitution secures to the citizen the right of suffrage, without which he could not exert his political power, and without which he would be impotent to secure to himself the full enjoyment of life, liberty and property.

For the accomplishment of the objects and ends of the government of the State, its powers are divided into three departments, to each of which is assigned its appropriate functions.

The judicial department is vested in various Courts, having either original or appellate jurisdiction or both, among which the Supreme Court is of highest authority. To it, as the Court of *dernier resort*, it may fairly be presumed the people intended the citizen might go, in matters of gravest concern, for the enforcement of his rights or for the redress of wrongs sustained. There is no right which is of greater value to him than his right to say by his vote who shall be intrusted with the exercise of the powers of the government in its several departments, because the free enjoyment of the right of choice is precedent and essential to the protection and security provided for and promised to him in the Constitution. Then to deny to him the right of appeal to the highest tribunal of the State in cases where he may have been deprived of a right which lies at the foundation of all others would, it seems to us, be depriving him of a privilege which it was designed by those who adopted the Constitution he should have and enjoy. To so interpret the provisions of the Constitution defining the jurisdiction of this Court as to close the door to his appeal would, in our judgment, be to refuse to appreciate the intention of the people who adopted the Constitution, as deduced from a view of it as a charter of our liberties, and would, by an adherence to the strict letter of the particular provision, involve us in a contradiction of the manifest design of the Constitution as a whole; and further, we would thereby hold that in cases involving rights of the highest and most sacred importance the party concerned could be heard only in Courts of inferior grade, though reason and justice might demand that he should have a right of redress commensurate with the magnitude of the interest at stake.

*Contemporaneous interpretation of a Constitution.*

In aid of the interpretation which we give to the section of the Constitution under consideration we may refer to the exposition and practice of the judicial department of the State Government since its organization. The highest Courts of original jurisdiction have been in the practice, from the begin-

ning, of taking cognizance of cases in which the subject matter was not susceptible of pecuniary estimation, and concerning which no mention in terms was made in the Constitution. Cases of divorce are of this class, as also suits to prevent threatened injuries, respecting the guardianship of children, honorary offices, and proceedings in the nature of writs of *quo warranto;* and in all such cases the Supreme Court, throughout the same period, entertained and exercised appellate jurisdiction. Contemporaneous exposition has ever been esteemed by jurists and statesmen as strong evidence in support of an interpretation or construction of a statute, or of a provision of the organic law in consonance with such exposition. *Contemporanea expositio est fortissima in lege* is a maxim of the civil law, resting for its support on a foundation of solid reason.

We do not mean to be understood as holding that, notwithstanding contemporaneous exposition on the part of the judicial tribunals and Legislatures of the State may be cogent evidence in aid of a particular interpretation or construction of the Constitution, that such interpretation or construction, even though sanctioned by long usage, should be upheld, if the same be clearly repugnant to the express and unequivocal terms of the instrument. It is to the words of the Constitution we must have recourse in the first place to ascertain what may be intended by any of its provisions. Its spirit and intent must be collected chiefly from its words, and what its words mean in their relations to each other and to the subject matter of its provisions, it is oftentimes the office of interpretation to discover.

The provision of the Constitution which the Court in *Conant* v. *Conant* was called upon to expound was regarded as failing to clearly define the jurisdiction of the Supreme Court in relation to the subject matter of that case, and others of like nature. It was considered as falling short of expressing the entire extent of the Court's appellate jurisdiction, and hence we may presume recourse was had to other provisions of the Constitution and to a consideration of its grand aims and pur-

poses, in order to ascertain its true meaning and intent. With
the exposition given to the fourth section of the Sixth Article
of the old Constitution by the highest Court of the State, the
section was amended and adopted by the people, but without
changing it so as to deprive the Supreme Court of appellate
jurisdiction in cases like the one before us. As we view the
subject in all its relations we must hold that this Court has
not the right to decline jurisdiction in the premises. (*Perry*
v. *Ames*, 26 Cal. 383, 387.)

Having disposed of the jurisdictional question raised by the
respondent, we now come to the consideration of the case upon
the merits.

Election precincts were duly established for Plumas County
for the general election held in 1865, and officers of election
were appointed by the Board of Supervisors for each of the
precincts so established. The following, to wit: Granite
Basin, Cascade, (Sullivan's,) Rush Creek, and Grizzly Valley,
were of the number of the precincts so established, and officers
of election were appointed for each of them. No election was
held at either of the places named. Instead of holding the
election at Granite Basin the Inspector and Judges appointed
for that place opened the polls and held the election at Buck-
eye House, six miles distant from Granite Basin. The Board
of County Canvassers opened and canvassed the votes given
at Buckeye House as votes cast at Granite Basin, and it
appearing that of the votes so given, the respondent received
five and Clark two, they were so counted and allowed. Polls
were opened and an election held at a certain Warehouse near
a place called Diamond Spring House. The Warehouse stood
on the line dividing the Counties of Plumas and Yuba, at a
distance of three miles from " Cascade, (Sullivan's.)" The
conduct of those who managed the election at the polls opened
at the Warehouse, was, to say the least of it, grossly irregular.
The persons who acted as Inspectors and Judges there, made
returns of the votes cast at the Warehouse, and they were
opened and counted by the County Canvassers as votes cast
at Cascade Precinct. The votes so given were fifteen in num-

ber and all were for the respondent for Sheriff, and were so counted and allowed by the Board. The Court finds that the officers of the election held at the Warehouse were absent therefrom five or six times during the day, and that the ballot box was taken from the house five or six times, but was in possession of the Inspector while absent, except in one instance, when it was not out of his sight. From the evidence, it appears that the Diamond Spring House was in Yuba County, and to that house the officers of the election frequently repaired during the day, taking the ballot box with them, and there remained until called on by some one who desired to exercise the right of suffrage, when they would go to the Warehouse and receive his vote and then repair again to the Diamond Spring House.

Instead of opening the polls and holding the election at Grizzly Valley, the election was held at the house of A. J. McPike, situated on Grizzly Creek, a mile distant from the valley. McPike's house was a mile from Grizzly Valley, the place designated and appointed by the proper authority as the place where the election should be held. The Court found that no polls were opened or held in Grizzly Valley on the day of the election; that the vote cast at the house of Mc-Pike was returned as the votes of Grizzly Valley, and that of the twenty-two votes so returned, sixteen of them were for the respondent, for the office of Sheriff, and six for Clark, for the same office, and were so counted and allowed by the Board of Canvassers.

The officers appointed to open the polls and hold the election at Rush Creek, instead of attending at the place designated and established for the purpose, opened the polls and held the election at Bull Frog Quartz Mill, situated about one mile distant from Rush Creek. So the Court found from the evidence, and further found, that the votes cast at the mill were opened and counted by the Board of County Canvassers as election returns from Rush Creek Precinct. Thirty-one votes were cast there, of which five were for the respondent for the office of Sheriff, and twenty-six for Clark for the same office;

and so they were counted and allowed by the Board of Canvassers.

The contestant charges in his petition that the conduct of the persons acting in the capacity of officers of election at three of the places named, to wit: at the Buckeye House, the Warehouse, and McPike's house, where elections were held, was wrongful and fraudulent, and that the returns made by them were counterfeit and false as representing the votes given at these places respectively, as given at other and different places corresponding to the places and precincts established by the Board of Supervisors. The respondent, on his part, by answer, makes like charges as to the conduct of the persons acting in the capacity of officers of election at Bull Frog Quartz Mill. A copy of the proclamation of the Governor designating the offices to be filled at the general election for the year 1865, was posted upon the Warehouse near Diamond Spring House, as required by the sixth section of the Act to regulate elections, to be posted at each place of holding elections; but no such copy was posted at the Buckeye House, nor at the Bull Frog Quartz Mill.

### Malconduct of an Election Board.

It is evident from the finding of the County Court there was no pretense on the trial that the Board of Supervisors designated the Warehouse as the place for holding the election in the Cascade Precinct. The testimony is conclusive that it was not. Sullivan's house, which was three miles from the Warehouse, was the place designated by the Board of Supervisors, and the fact that a copy of the proclamation was posted upon the Warehouse is not sufficient to overcome the direct and positive evidence that Sullivan's house was the place designated. The conduct of the persons acting as officers of the election in opening the polls and holding the election at a distance of three miles from the place appointed by the proper authority was without any just excuse, and unauthorized, and in that respect was in the sense of the

statute malconduct. Its reprehensibility was intensified by
the fact that the Warehouse stood upon the dividing line
between the two counties, and it is left in doubt whether the
votes offered and given at that place were cast in the County
of Plumas or Yuba. Besides which, it is in evidence that the
ballot box was floating most of the day between the Ware-
house and the Diamond Spring House, which was confessedly
in the County of Yuba; and one at least of those who were
acting in an official character at the election was so intoxi-
cated as to be unable to attend to the duty to which he was
assigned and which he had undertaken to perform.

We are aware that Courts have been very indulgent respect-
ing the omissions, inadvertencies and mistakes of officers of
elections, lest by exacting of them a technical compliance
with the requirements of the law the citizen might be deprived
of a sacred right. We are not disposed to be less indulgent
in respect to the observance of forms and methods than have
been the Courts to which counsel have referred; but we deem
it of the highest importance to the protection of the elective
franchise that the law should be complied with in substance,
and that those intrusted with the discharge of the duties per-
taining to elections should be required so to perform them as
to preserve the ballot box pure. Others besides those who
may lose their votes by the malconduct of officers of elections
are concerned; and while seeking upon just principles to save
to the elector his vote offered and given in good faith, we are
not to forget that he himself, as well as all honest people, are
vitally interested in the protection of the right of suffrage
against the fraudulent machinations and devices of men whose
partisan moral code bears upon its title page the infamous
maxim, "All is fair in politics." These observations are
made to show the importance of so far adhering to the sub-
stantial requirements of the law as to protect and preserve
elections from abuses subversive of the inherent and constitu-
tional rights of the people. We are of the opinion that the
election held at the Warehouse was invalid, and that the votes
polled there should have been rejected and disallowed.

The election held at the Buckeye House was at a place not authorized by the Board of Supervisors. It was distant from the place designated six miles, and though, for aught that appears, the officers there conducted the election in an orderly manner and fairly, they had no right to hold the election at a place other than that fixed by the Supervisors. We do not say officers of election would not have authority to hold the election at any other house than the one designated by the Supervisors in case of necessity, provided the same be held in · the immediate vicinity of the place designated, but in case of a deviation from the order of the Board of Supervisors, a reason and necessity therefor should be shown to exist. To allow any other practice to obtain would expose those under political excitement .to temptations which, yielded to, might be subversive of the great objects and ends of free suffrage to be exercised at popular elections. For the reasons in part assigned for declaring the election held at the Warehouse invalid we hold the election held at the Buckeye House to be so.

The elections held at McPike's house and at the Bull Frog Quartz Mill are respectively in the same condition and predicament as that held at the Buckeye House, and must in like manner be declared invalid.

Rejecting the votes cast at the Warehouse, at the Buckeye House, at McPike's house and at the quartz mill, S. J. Clark appears to have been elected Sheriff by a majority of two votes. Therefore the judgment appealed from declaring James H. Yeates elected and entitled to the office of Sheriff of Plu-·mas County must be and is hereby reversed; and it is hereby adjudged and decreed that S. J. Clark was elected .to said . office at the general election held in 1865, and that he is therefore entitled to have, hold and exercise said office of Sheriff in and for said County of Plumas.