4   313
9*  697
11* 214
14* 289
14* 293

# THE UNITED STATES, RESPONDENT, *v.* LORENZO SNOW, APPELLANT.

VIDE SNOW *v.* UNITED STATES, 118 U. S., 346. IN RE SNOW, 120 U. S., 274.

EDMUNDS ACT—PURPOSE OF STATED.—The purpose and aim of the act of Congress of March 22, 1882, ch. 47, 22 stat. 31, commonly called "the Edmunds act," considered and the same conclusions arrived at as in the preceding case.

APPEAL from a judgment of the district court of the first district, and from an order refusing a new trial. The indictment in this case charged the defendant with cohabiting with more than one woman during the year 1883; the other facts appear in the opinion.

*Messrs. Bennett, Harkness & Kirkpatrick, and Mr. F. S. Richards,* for the appellant.

*Mr. W. H. Dickson,* for the respondent.

POWERS, J.:

The main question for our consideration in this case is: can a man, while recognizing, supporting, and holding out to the world his lawful wife as a wife, live with and hold out, support and recognize as a wife another woman, and not be liable to punishment under the Edmunds law? In other words, if such a state of facts exists as is indicated by the question stated, is the man guilty of cohabitation?

To answer this question we must interpret the Edmunds law. We must consider the occasion and necessity for the law. We must ascertain the mischief felt and the object and remedy in view: Dwarris on Statutes, 194; *Wenner* v. *Smith,* ante p. 238. We must try and give the law such an interpretation as will effect the purpose for which it was passed. We must arrive at its true spirit and meaning, and try and read its purpose aright. The question is an

important one; perhaps as important as any that has been raised with reference to this most important statute. Its determination involves the question whether the law has any force or vitality, and whether it is sufficient to accomplish the purpose which brought it into being, or whether it shall be henceforth a dead statute.

The American idea of government is founded on the Christian idea of home, where one father and one mother, each the equal of the other, happy in the consciousness of mutual and eternal affection, rear about the hearthstone an intelligent and God-fearing family. Patriotism springs from love of country, which is born of a love for home. Virtue and morality are the flowers which adorn the hearthstone of the true family.

It was said in *Reynolds* v. *United States*, 98 U. S., 165, that "marriage, while from its very nature a sacred obligation, is nevertheless, in most civilized nations, a civil contract, and is usually regulated by law. Upon it society may be said to be built, and out of its fruits spring social relations and social obligations and duties, with which government is necessarily required to deal. In fact, according as monogamous or polygamous marriages are allowed, do we find the principles on which the government of the people, to a greater or less extent, rests. Professor Lieber says, polygamy leads to the patriarchal principle, and which, when applied to large communities, fetters the people in stationary despotism, while that principle cannot long exist in connection with monogamy. Chancellor Kent observes that 'this remark is equally striking and profound:' 2 Kent's Com. 81, note *c.* An exceptional colony of polygamists, under an exceptional leadership, may sometimes exist for a time without appearing to disturb the social condition of the people who surround it; but there cannot be a doubt that, unless restricted by some form of constitution, it is within the legitimate scope of the power of every civil government to determine whether polygamy or monogamy shall be the law of social life under its dominion." In the same case, on page 164, it is said that 'polygamy has always been odious among the northern and western nations of Europe, and, until the establishment of

the Mormon church, was almost exclusively a feature of the life of the Asiatic and of the African people." At common law, the second marriage was always void, 2 Kent's Com., 79, and from the earliest history of England polygamy has been treated as an offense against society. By the statute of 1 James II., c. 11, the offense, if committed in England or Wales, was made punishable in the civil courts, and the punishment was death.

"As this statute was limited in its operation to England and Wales, it was at a very early period re-enacted, generally with some modifications, in all the colonies. In connection with the case we are now considering, it is a significant fact that on the eighth of December, 1788, after the passage of the act establishing religious freedom, and after the convention of Virginia had recommended as an amendment to the constitution of the United States the declaration in a bill of rights, that 'All men have an equal, natural, and unalienable right to the free exercise of religion, according to the dictates of conscience,' the legislature of that state substantially enacted the statute of James II., death penalty included, because, as recited in the preamble, 'it hath been doubted whether bigamy or polygamy be punishable by the laws of this commonwealth:' 12 Henning's Statute, 691. From that day to this we think it may safely be said that there never has been a time in any state of the Union when polygamy has not been an offense against society, cognizable by the civil courts, and punished with more or less severity."

Polygamy has been and now is prohibited by the law of Mexico, so that even before this territory was ceded to the United States the practice was unlawful here under the laws of our sister republic, as it was at the common law and by the statutes of the states. In 1862 Congress passed an act against polygamy, which was declaratory merely of the common law then in force, with the addition that it fixed a penalty for its violation. The Reynolds case declared the law valid, and also held that polygamy could not be carried on lawfully under the cloak of a religious faith. In that case it was said that "laws are made for the government of actions, and while they cannot inter-

fere with mere religious beliefs and opinions, they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice? Or if a wife religiously believed it was her duty to burn herself upon the funeral pile of her dead husband, would it be beyond the power of the civil government to prevent her carrying her belief into practice? So here, as a law of the organization of society under the exclusive domain of the United States, it is provided that plural marriages shall not be allowed. Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the laws of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances."

Notwithstanding the fact that polygamy was an offense at the common law, and held in abhorrence by the Christian world, and that the laws for its suppression are declared by the highest court to be constitutional, the Mormon church, which had established itself in this territory and had built its structure upon the corner-stone of plural marriage, continued to grow and flourish, and to defy the law. It preached plural marriage, practiced it openly, and boldly proclaimed its right to do so, the laws and customs of the country to the contrary notwithstanding. It claimed that the practice was right, and while all its members did not practice polygamy, all advocated and defended the practice. No man is a true Mormon who does not believe in the doctrine of plural marriage. The church was active in proselyting, and brought thousands of converts from foreign lands each year. It built up a strong and powerful government, uniting church and state, which in its laws and practices is antagonistic to the very foundation principles of the United States. Here, then, was a people building up an empire within the republic, whose members defied the laws of the land, and boldly advocated and permitted practices which were at

war with the laws, customs, and traditions of the American people. The statute of 1862 had proved inadequate, and in 1882 what is termed the Edmunds act was adopted.

This act in its first section provides for the punishment of persons within the territories who, having a husband or wife living, marry another, and also provides for the punishment of any man who simultaneously, or on the same day, marries more than one woman.

The act, therefore, makes plural marriage an offense. It provides for the punishment of the act of plural marriage, without reference to its consummation or to cohabitation.

The third section of the act provides for the punishment of any male person who cohabits with more than one woman. It therefore makes unlawful the appearance of marriage. The act, taken as a whole, is plainly seen to be dealing with the marriage relation. It is endeavoring to put an end to the evils resulting from plural marriages, and from the evil example set before the world by the polygamous household. It is the third section of the act that we must construe, and in arriving at its proper construction we are aided greatly by the decisions of this court and of the supreme court of the United States, in the case of the *United States* v. *Cannon*, where it was held that the misdemeanor against which the act is directed is the offense against the marriage relation, and that to establish the guilt of a party, evidence of sexual intercourse is unnecessary. The supreme court in that case said that the statute "seeks not only to punish bigamy and polygamy, when direct proof of the existence of these relations can be made, but to prevent a man from flaunting in the face of the world the ostentation and opportunities of a bigamous household, with all the outward appearances of the continuance of the same relations which existed before the act was passed."

It was said by Boreman, J., in *United States* v. *Cannon*, ante p. 122, that the object of this statute was, "judging from the whole act, to aid in breaking up polygamy and the pretense thereof. The well-recognized difficulty of reaching the polygamous cases by reason of having to

prove marriage, and by reason of the fact that the statute of limitations bars prosecutions after three years, no doubt led Congress to pass this act. It was sought to break up the polygamic relation . . . whether marriage took place or not, the pretense of marriage—the living to all intents and purposes, so far as the public could see, as husband and wife, a holding out of that relationship to the world, were the evils sought to be eradicated. It reaches out and embraces all men living and dwelling with more than one woman as if married, whether any marriage has ever taken place or not." And again in the same case, it is said that the law-making power saw that the mere fact of a plural marriage is an evil example; that the living and associating with two or more women as if married to all tends to weaken the popular appreciation of true marriage, and this is detrimental to society. Therefore, for the purpose of protecting the marriage relation, the law under discussion was passed. It is directly aimed at the suppression of polygamy and the polygamous household, as an evil example, dangerous in its tendency to the family relation as recognized by this nation. It was not the offense against chastity merely, but the offense against the family, which Congress intended to suppress.

And in *United States* v. *Musser*, ante p. 153, Zane, C. J., said: "The end of the law was the protection of the monogamous marriage; and the suppression of polygamy and unlawful cohabitation were but means to that end. It is proper, also, to take into consideration the conditions, as the national legislature anticipated and understood them, in which the law was to be applied and enforced. They knew that the time had elapsed within which a very large portion of those living in polygamy could be punished for that offense, and that many of these were among the most influential men in society, being the heads of the church, and that the example of their continuing to live with their plural wives, under a claim of divine right, would be a scandal to society and a menace to the lawful marriage; that such examples would be a continuing invitation and apparent justification for their followers either secretly or openly to violate the law. Congress, there-

fore, forbade plural marriage in appearance only, as well as in form, and by the example of punishment it doubtless intended to eradicate the example of apparent plural marriages, as well as the plural marriage in form." Such being the intent and object of the section of the statute under consideration, how can it be possible to answer the question stated at the outset of this opinion in the affirmative? If the intent and purpose of the law are to protect monogamic marriage, how are the intent and purpose carried out if a man, while maintaining, supporting, recognizing and holding out his lawful wife, may yet forsake her and revel in the arms of another? How can the example of plural marriage be made productive of greater evil than to permit such things as indicated? In this very case—the case of one of the twelve apostles of the Mormon church—Harriet Snow, one of the plural wives, testified that "when a lady gets so that she cannot bear children, she is released from some of her duties as a wife." The husband may then seek the charms of a younger and fairer woman. Can that be done with impunity and in defiance of a statute passed, as the courts say, to prevent the evil appearance and example of the plural family, and to prevent polygamists from flaunting in the face of the world the opportunities of the polygamous household? If so, then the act should be entitled, "An act to enable a man to forsake his lawful wife and fly to the arms of his concubine."

But it is argued, because the man has been dwelling and dining with another woman, therefore he has not been cohabiting with his wife. He must actually dwell with her, it is said. Is this true? Must a man take his meals with his wife to be living with her? Must they be under the same roof? If so, what becomes of the large class of commercial men who pass but few days at home during the whole year? Must a man pass a certain number of days and nights with his wife in order to be considered as living with her? Certainly not. As the husband goes about his daily avocation he is living with his wife. When he rides with her, walks with her, or talks with her, when he visits her, he is living with her. If he sees her daily, or but a

few times a year, he is living with her; he is cohabiting with her. If there has been no legal separation or divorce, whether one roof shelters them or not, if he holds her out ·to the world as a wife, supports her and recognizes her as a wife, they are living together. It is a presumption that is conclusive, and is founded upon reasons of public policy. The law presumes a usual and ordinary state of things rather than a peculiar and exceptional condition. It supposes legality rather than crime, and virtue and morality rather than the opposite qualities: *Caujolle* v. *Ferrie*, 23 N. Y. 138. The legitimacy of offspring born during wedlock is presumed, even while the parties are living apart by mutual consent: Id. 139.

If when the Edmunds act was passed the defendant had withdrawn himself from all but his lawful wife and dwelt with her, ostensibly refraining from dwelling with his illegal wives, though he supported them and visited them, the presumption of cohabitation would not have arisen. The presumption of innocence would put the prosecution to its proof that he lived with more than one woman.

If we are not right, then the law can be easily evaded. A man can fill a house with plural wives, and himself live in another house. He can hold them out to the world as wives, support them, visit them, and because they do not physically dwell or live together he would go free. An interpretation of the law like that sought by the defendant would lead to absurd results. We have considered the ·intention of the law, and we would violate well-known rules of construction to hold that it will not cover a case like the present.

In *United States* v. *Fisher*, 2 Cranch, 399, it is said that when a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature should be understood to· mean what they plainly expressed, and consequently no room is left for construction. But if, from a view of the whole law, or from other laws *in para materia*, the evident intention is different from the literal import of the terms employed to express it in a particular part of the law, that intention should prevail, for that in fact is the will of the legislature. . . . So if the literal

expressions of the law lead to absurd, unjust, or inconvenient consequences, such a construction should be given as to avoid such consequences, if from the whole purview of the law, and giving effect to the words used, it may be fairly done. These rules are not merely artificial; they are as clearly founded in plain sense as they are certainly warranted by the principles of the common law.

In *Ex parte* Ellis, 11 Cal., 224, it is stated that as it is the duty of courts to execute all laws according to their true intent and meaning, that intent, when collected from the whole and every part of the statute taken together must prevail, even over the literal sense of the terms, and control the strict letter of the law, when the letter would lead to possible injustice, contradiction, and absurdity.

And in Smith's Com., 663, 664, this language is used: "When in a particular construction of a statute, applied to a case which it seems by its terms to include, there follows from such construction an absurd consequence, respect for the legislature will induce the court from thence to conclude that some other construction, which will not produce such a consequence, ought to be adopted. Hence, every construction which leads to an absurdity ought to be rejected. It is said that this rule should be followed even in cases where there is neither obscurity nor anything equivocal in the law itself, for the absurdity of the literal sense of the law itself does not proceed merely from the obscurity, or any other fault in the expression, but from the narrow limits of the human mind, which cannot foresee all cases and circumstances, or include all the circumstances or consequences of what is ordained; that it is impossible for the legislature to enter into immensity of detail. It can only make laws in a general manner, and in applying their acts to particular cases the construction ought to be conformable to the intention of the legislature. It cannot be presumed that the legislature intended anything absurd. When therefore the words, when taken in their obvious and proper sense, lead to it, it is necessary to turn them from that sense just as far as is sufficient to avoid an absurdity, if from the whole purview of the law, and giving effect to all the words used in it, it may fairly be done."

"Rational interpretation is when the words of an instrument do not express the author's intention perfectly, but either exceed or fall short of it, so that the intention is to be collected from probable or rational conjectures only; and mixed interpretation, that is, an interpretation partly literal and partly rational, is when the author's words, though they do express his intention when rightly understood, are in themselves of doubtful meaning, rendering it necessary to have recourse to the like conjectures to find out in what sense the words were used; in which case the intention is collected from the words, but not without the help of other conjectures: Rutherford's Institutes, b. 2, c. 7, sec. 3.

By means of these rules of interpretation the spirit of the text is saved from sacrifice to its strict letter. When the provisions of a statute, or of the organic law, are clear and precise, and attended with no difficulty in the application, there is no room for any interpretation or comment. The intention of the lawgiver is what must be adhered to. But if the language of the instrument is indeterminate, vague, or susceptible of a more or less extensive sense, we must presume the intention according to the laws of reason and equity; and for this purpose it is necessary to pay attention to the nature of the things to which the question relates: *Knowles* v. *Yates*, 31 Cal. 86.

Kent says: "It is an established rule in the exposition of the statutes that the intention of the lawgiver is to be deduced from a review of the whole and every part of the statute, taken and compared together. The real intention, when accurately ascertained, will always prevail over the literal sense of terms. When the expression in a statute is special and particular, but the reason is general, the expression shall be deemed general;" and he also holds that the reason and intention of the lawgiver will control the strict letter of the law when the letter would lead to palpable injustice, contradiction and absurdity: 1 Kent's Com., 461, 462.

We think that the court below charged the jury correctly. To hold otherwise would, as we have seen, lead to absurd consequences, and to an absurd construction

of the Edmunds act.   The following is the language of the court:

"If you [the jury] find, beyond a reasonable doubt, that the defendant had during the year 1883 a legal wife living in Brigham City, Box Elder county, Utah territory, from whom he was undivorced; that he recognized her as his wife; held her out as such, and contributed to her support as such wife; and that during that year he lived with the woman Minnie, recognizing her as his wife, associated with her as such, and supported and held her out as a wife, then the offense of unlawful cohabitation is complete, and you will find the defendant guilty.   The legal wife in this case is the woman whom the defendant first married."

The principal question in this case, and the general principle underlying the instruction to the jury which we are considering, was, we think, decided by this court at the present term in the case of the *United States* v. *Lorenzo Snow,* ante page 280, indictment for the year 1885.   That was a case against the same defendant.   This court, speaking by Zane, chief justice, said: "It appears from the evidence that appellant boards and lodges with his last wife, and visits his other wives occasionally, though not very often; that during the year 1885 he has not lodged or taken a meal with any one of the others; that he furnishes them houses to live in, and supports them; that he introduces them publicly as his wives, and by his language and conduct holds them out to the world as such.   The evidence proved beyond controversy that defendant cohabits with his polygamous wife Minnie.   The remaining fact to find from the evidence is, has he, at any time during the year 1885, cohabited with the other women named in the indictment, or any one of them?   It appears from the evidence that defendant is seventy-two years old, and has married nine wives, and that seven of those wives are still living.   To the first he was married in his youth.   As his passion for one wife became satiated and dulled by indulgence and gratification, and as his lust was again kindled by the appearance of a younger and fresher, or possibly a more attractive woman, he would marry again, until his marriages have been repeated nine times, and now, at the age of

seventy-two years, he is found with seven living wives—
the last being comparatively young, with an infant in her
arms. He furnishes homes for, supports, associates with,
claims, holds out, and flaunts in the face of society all
these seven women as his wives. And yet he says he co-
habits with but one. The law must characterize his rela-
tion to them, and his intercourse and association with
them."

And the court proceeds to show that the law character-
izes such conduct as cohabitation. Again, the court says:

"A lawful marriage of itself affords a strong pre-
sumption of cohabitation, because such cohabitation is
in accordance with duty, and usually attends such a mar-
riage."

The court then says that when to this presumption are
added the further inferences from the following facts,
that the defendant claimed his legal wife all the time
as his wife, and that she claims to be such; "that he
provides for her a home, and the necessaries and com-
forts of life; that they were on good terms; that he took
her to the theatre, out riding, visited her occasionally at
her home, and was the father of her children, the con-
clusion removes every reasonable doubt that he cohabited
with her as his wife. When they were associating to-
gether, she was not his paramour or his friend simply—he
then had, and still has, all the rights and opportunities of
a husband, and she those of a wife. They were living
together. Under such circumstances the law will not per-
mit them to say they were together merely as friends,
and not as husband and wife."

Apply the foregoing reasoning to the case at the bar.
The testimony shows conclusively that the defendant
had a legal wife living from whom he was undivorced.
He recognizes her as his wife. He supported her as
such, and he held her out to the world as such. In the
language of the chief justice, "he then had and still has
all the rights and opportunities of a husband and she
those of a wife." He held her out to the world as a wife.
By that is meant and by that is understood such language
and conduct as leads the world to believe that the par-

ties are living and associating as husband and wife. That is the meaning of the term "holding out." When a man lives and associates with two or more women as a husband with his wife, he is guilty of cohabitation. We think in the present case that the law will not permit the defendant to deny that he cohabited with his legal wife. He was undivorced; they had not separated; he supported her as a wife; he recognized her as a wife; he held her out as his wife, or in other words, his language and conduct with her and towards her were such as to lead the public to conclude that they were living as husband and wife. Under such a state of facts, and adding the further facts stated in the opinion of Justice Boreman in the case for 1884, a case in which the facts are identical with this, the strong presumption of cohabitation which arises from the simple fact of lawful marriage becomes conclusive, and cannot be rebutted.

When, therefore, we take into consideration the fact that the defendant did not deny dwelling with the woman Minnie, whom he held out to the world and supported as his wife, the charge of the court is seen to be correct.

The other questions arising upon the record are disposed of in the other cases against the same defendant, decided at this term.

The judgment of the court below is affirmed.

BOREMAN, J., concurred.

ZANE, C. J., dissenting:

The law which the defendant was convicted of violating declares "that if any male person . . . cohabits with more than one woman he shall be deemed guilty of a misdemeanor," etc. The term "cohabitation," as here used, means dwelling or associating together, apparently as husband and wife. The conduct of the parties with respect to each other must present the semblance of marriage. They must spend some part of their time together. That they dwell in the same country, city, or neighborhood is insufficient. They should live or associate together a portion of the time. The court below in-

structed the jurors that if they believed from the evidence that defendant had a lawful wife living, that he contributed to her support, and recognized and held her out as his wife, cohabitation as to her was established. In effect, the jury was told that lawful marriage, contribution to support, and recognition and holding out either constituted cohabitation or afforded a conclusive presumption thereof. I think that the existence of such facts alone would not constitute cohabitation; nor does the law conclusively presume cohabitation from them. It appears from the evidence that Adeline (one of the women named in the indictment) was defendant's lawful wife. And the evidence does not show that defendant, during the time mentioned in the indictment, was ever in her company, or that during such time he spoke to her, or she to him. It was agreed by the parties on the trial that the jury might consider the case, as if Adeline had stated before them that she had not in any wise lived with defendant during the time mentioned in the indictment.

I am of the opinion that the evidence was insufficient to constitute cohabitation with Adeline, the lawful wife; nor was cohabitation with her conclusively presumed, and that the charge to the jury was erroneous in the respect pointed out. I therefore dissent from the judgment of the court.