HEYFRON, RESPONDENT, v. MAHONEY, APPELLANT.

ELECTIONS—*Name of candidate misspelled.*—Under section 1044, fifth division of the Compiled Statutes, providing that technicalities, or error in spelling the name of any candidate for office, shall be disregarded on the trial, it was properly ordered, in the trial of an election case, that certain votes, with the name "Dan Heyfron," should be counted for Daniel J. Heyfron, he being a candidate for the office for which such votes were cast, and being the only person having this surname within the county.

SAME—*Failure of judges to take oath.*—Where there is a fair vote and an honest count, it is no ground for the rejection of the returns of a voting precinct that the judges of election were not sworn. (Case of *Wells* v. *Taylor*, 5 Mont. 208, affirmed.)

SAME—*Place of voting.*—Where the election in a certain voting precinct was held at a place more than three miles distant from the place designated by the commissioners of the county, the election is void, and the vote returned from such precinct is properly excluded from the total of votes cast in the county.

SAME—*Apportionment of illegal votes.*—Where it appeared that a certain number of votes cast at a particular precinct were illegal, a finding by the court, apportioning said illegal votes and deducting them from the whole vote received by each party to the contest, in the proportion that the vote of each party bore to the whole vote cast at said precinct, was proper where there was evidence to support the finding, although the entire vote of such precinct might have been properly excluded as tainted with fraud.

SAME — *Amendments during trial of contest.* — The provisions of the Code of Civil Procedure, relating to amendments to pleadings, apply to election contests, and the permitting of an amendment to a statement of contest in correcting the spelling of the names of persons, and the addition of other names to conform to the proof, is not an abuse of judicial discretion when it does not appear that the adverse party was misled thereby.

SAME — *Evidence — Subpœna.* — Upon the trial of an election contest the contestant offered in evidence a subpœna, together with the return of the coroner, showing that he was unable to find the persons named therein, comprising the alleged illegal voters. *Held*, that the subpœna and return tended to prove a proper effort on the part of the contestant to bring before the court the best evidence, and was properly admitted.

*Appeal from Second Judicial District, Missoula County.*

The cause was tried before DE WOLFE, J.

*Woody & Webster,* for Appellant.

The subpœna, with the coroner's return thereon, was inadmissible and incompetent as evidence; and its admission by the court over the objection of appellant was error. During the trial the respondent, by leave of the court, filed an amendment to the eleventh ground of contest, and the appellant then moved the court to strike out a portion of said amendment, which motion was overruled by the court; and this we hold was error. The evidence does not support the findings of the court in this. It does not show that 66 illegal votes, or any illegal votes, were cast at Bonner precinct. The evidence does not show that the persons whose names are contained in the list of names furnished by the witness Chandler were the same persons whose names are contained in the poll-book of that precinct. The evidence also wholly failed to show that any illegal vote was cast at Bonner for the appellant for the office of sheriff. This was the issue made by the pleadings, and the appellant contends that under the pleadings and the law the respondent was bound to show, not only that illegal votes were cast, but that they were cast for appellant; and that "if it cannot be shown for whom the illegal votes were cast, then the complaint must fail for want of proof, the same as any other case which is lost for want of sufficient evidence to sustain it." (*McDaniel's Case*, Brightly's Leading Cases on Election, pp. 248, 249; *Tarbox* v. *Sughrue*, 36 Kan. 225; *Ex parte Murphy*, 7 Cowan, 153; *People* v. *Cicott*, 16 Mich. 283; *Sudbury* v. *Stearns*, 21 Pick. 148; *Trustees* v. *Gibbs*,

2 Cush. 39; *Deloatch* v. *Rogers,* 86 N. C. 360; *Judkins* v. *Hill,*
50 N. H. 140; *State* v. *Lehre,* 7 Rich. 234; *McNeely* v. *Woodruff,* 1 Green, 352; *People* v. *Tuthill,* 31 N. Y. 550; *Prince* v.
*Skillin,* 71 Me. 361.)

*Word & Smith,* for Respondent.

By reference to the affidavit of contest and the answer of
appellant, it will be seen that the appellant, by refusing to deny
the allegation, virtually and legally admits that the 6 votes
*cast for Dan Heyfron* at Noxon precinct should have been
counted for the respondent, and upon these allegations the
respondent was entitled to a judgment, to have said 6 votes
counted for him for the office of sheriff of said county.  The
election at O'Keefe precinct was held at a place three and one-
half miles distant from the house designated by the board of
county commissioners.  This action of the court in excluding
said precinct from the vote for sheriff was legal and proper, and
is sustained by the law in most adjudicated cases.  (See McCrary
on Elections, §§ 123, 124; *Knowles* v. *Yates,* 31 Cal. 93, 94.)
Where the record does not disclose the evidence upon which a
finding of the court is based, it is presumed that the judgment
of the court was sustained by the proof.  (See *Wilson* v. *Davis,*
1 Mont. 189, 190; *Morse* v. *Swan,* 2 Mont. 307; *Chumasero* v.
*Vial,* 3 Mont. 378, 379; *Story* v. *Black,* 5 Mon. 41.)  Many
other cases could be cited to the same effect, and where the evi-
dence in a case upon which a court bases its findings is conflict-
ing the cause will not be reversed.  (See *Reynolds* v. *Snow,* 67
Cal. 497.)  And first, did the court err in allowing the respond-
ent to introduce in evidence a subpœna issued to the coroner of
Missoula County, for all the persons charged by the respondent
as illegal voters at Bonner precinct, with the coroner's return
that the parties (except one or two) could not be found in Mis-
soula County?  It will be remembered that the election took
place November 6, 1888, and the subpœna was issued December
22d, and returned December 26, 1888, by the coroner.  Now if
these parties were residents and voters on November 6, 1888, it
is hardly probable that all had removed from the county before
December 22d, less than sixty days after the election.  To show

that the persons charged as illegal voters were not residents of the county, the respondent had the subpœna issued and placed in the hands of the proper officer for service, and the introduction of this subpœna and the coroner's return was proper, and was the best way of proving that the persons were not in the county. Unless the appellant can show that his interests were prejudiced by this innocent subpœna, the cause will not be reversed. ( *Gillett* v. *Clark,* 6 Mont. 193; *Norwood* v. *Kenfield,* 30 Cal. 394.) Under a statute like ours, where it is absolutely impossible to show how the illegal vote was cast, what course will the courts pursue in determining a contest for office, when it has been shown that *illegal votes, sufficient to change the result,* have actually been polled and counted? All the authorities agree that the polls should be purged of the illegal votes, unless the court or board canvassing have the *power to order a new election.* The courts here on the trial of a contest have no power to order a new election and declare the office vacant; hence the judge trying the cause must, under the law, resort to one of two different ways to purge the poll: *First,* deduct all the illegal votes from the candidate receiving the highest vote at the particular poll or precinct; or *second,* deduct the *illegal votes* from the whole vote of that particular precinct, in the proportion that each candidate's vote bears to the whole vote; in other words, *divide the illegal votes between the candidates* in the *same proportion* that the total vote cast for each candidate bears to the whole vote of said precinct. This was the course adopted by the trial court in the case at bar, and it is sustained by almost all the authorities and law writers. (McCrary on Elections, §§ 460, 461, 462; *People* v. *Cicott,* 16 Mich. 311.)

BLAKE, C. J.— At the general election, held November 6, 1888, Daniel J. Heyfron was the Democratic, and Cain B. Mahoney was the Republican candidate for the office of sheriff of the county of Missoula. The official canvass of the returns from all the precincts showed that Mahoney had received 1,843 votes and Heyfron 1,797 votes, and the certificate of election was delivered to the first-named person. Heyfron then initiated this contest by filing with the county clerk his statement, which sets forth many grounds under the provisions of the statute.

(Comp. Stats. div. 5, §§ 1043, 1044.) Mahoney interposed a demurrer, which was overruled, and thereupon answered, and Heyfron filed his replication. The cause was tried by the court without a jury, and the evidence, which was offered by the contestant, related solely to the precinct at Bonner, where Mahoney had 171 votes and Heyfron had 51 votes. No testimony was introduced by Mahoney, and the court made its findings of the facts from the pleadings and the evidence, and adjudged that Heyfron was entitled to the office. The motion of Mahoney for a new trial was overruled, and an appeal was taken to the Supreme Court of the Territory of Montana. The transcript does not contain any request for a finding in writing by the parties, and we will examine the errors which have been assigned.

It is admitted by the pleadings that six ballots were cast at the precinct of Noxon with the name of "Dan Heyfron" for the office of sheriff upon them; that the contestant was the only person having this surname within the county of Missoula; and that the board of canvassers did not count the same for the respondent. The statute requires that "the District Court shall hear and determine in such manner as shall carry into effect the expressed will of a majority of the legal voters, as indicated by their votes for such office, not regarding technicalities or error in spelling the name of any candidate for such office." (Comp. Stats. div. 5, § 1044.) It was therefore properly ordered that these votes should be counted for Daniel J. Heyfron for said office.

The court further finds "that the whole vote returned by the canvassers from O'Keefe precinct, being 28 votes for contestee, Cain B. Mahoney, and 12 votes for contestant, Daniel J. Heyfron, be excluded or thrown out and disregarded in making up the sum total of votes cast in the county for said office of sheriff." The statement of the contestant upon this ground is as follows: "Because, at the voting precinct known as 'O'Keefe,' the election was not held at the place designated by the county commissioners for holding the election, and because the judges who held such election were not sworn. The place designated by the county commissioners was the house of one Blanchard, and the election was held at Evaro, more than three miles distant from the place designated by the commissioners." The answer

does not deny these averments, but alleges the reasons for the opening of the polls at Evaro; that one of the judges who had been appointed, and had in his possession the poll-books and ballot-box, notified the persons at Blanchard's house of this change; that every citizen who lived in the vicinity voted; and that no one was prevented by this removal from voting; and that the election held at this precinct was conducted honestly, and according to law. The replication controverts these reasons, which are matters regarding the convenience of voters, the size of Blanchard's house, and the quantity of whisky therein on the day of the said election, and "denies that all the voters of said precinct of O'Keefe had an opportunity to vote at said election." No evidence upon this point appears in the record, and we must be governed by the pleadings, which confess the facts specified in this ground. "Previous to votes being taken, the judges . . . . shall take and subscribe the . . . . oath." (Comp. Stats. div. 5, § 1015.) The statutes provide for the holding of elections "in the several counties, townships, or precincts in this Territory"; that the board of commissioners of the counties shall set off and establish "townships or precincts, when the same may be necessary"; that the clerk of the board "shall, at least thirty days before any general election, make out . . . . three written notices for each township or precinct, said notices to be, as near as circumstances will admit, as follows: Notice is hereby given that . . . . at the house of ———, in the county of ———, an election will be held; . . . ." that these notices shall be posted in the township or precinct, "one at the house where the election is authorized to be held; . . . ." and that the form of entry in the poll-books, "as near as circumstances will admit," shall be as follows: "At an election held at the house of A B, in the township or precinct of ———." (Comp. Stats. div. 5, §§ 1009, 1011, 1013, 1014, 1030.)

We cannot ascertain from the transcript the views of the court below upon the objections of the contestant to the returns of the O'Keefe precinct. That which is founded upon the failure of the judges to be sworn cannot be sustained. In *Wells* v. *Taylor*, 5 Mont. 208, Mr. Chief Justice Wade, as the organ of the court, said: "The question is, was there a fair vote and an honest count? If there was, the election is valid, though the

officers conducting the same were not duly sworn or chosen, or did not possess the qualifications requisite for the office." (And see the cases there cited.)

What, then, was the legal effect of the removal of the polling place more than three miles from the house of Blanchard to Evaro? Mr. McCrary, in his work on Elections, writes: "It must be conceded by all that time and place are of the substance of every election, while many provisions which appertain to the manner of conducting an election may be directory only." (§ 141. 3d ed.) The same opinion is expressed by Mr. Paine in his treatise on Elections. "The requirement that the election shall be held at the place designated by law is not directory; it is mandatory, and must be obeyed." (§ 327.) In *Knowles* v. *Yates*, 31 Cal. 92, the court says: "Sullivan's house, which was three miles from the warehouse, was the place designated by the board of supervisors, and the fact that a copy of the proclamation was posted upon the warehouse is not sufficient to overcome the direct and positive evidence that Sullivan's house was the place designated. The conduct of the persons acting as officers of the election, in opening the polls and holding the election at a distance of three miles from the place appointed by the proper authority, was without any just excuse and unauthorized, and in that respect was, in the sense of the statute, malconduct." In *Melvin's Case*, 68 Pa. St. 338, Mr. Chief Justice Thompson says: "A fixed place, it seems to me, is as absolutely a requisite, according to the election laws, as is the time of voting. The holding of elections at the places fixed by law is not directory; it is mandatory, and cannot be omitted without error. I will not say that in case of the destruction of a designated building on the eve of an election, the election might not be held on the, same or contiguous ground as a matter of necessity — *necessitas non habet legem.* But then the necessity must be absolute; discarding all mere ideas of convenience. . . . . To move the place of election three miles from that designated by law, or from a village and across a considerable stream a half a mile or more distant from the village where it ought to have been held, or from a designated school-house to a vacant house more than a half a mile distant therefrom, without authority or any absolutely controlling circumstances, must render the election therein

void, and if the votes taken be counted, constitute an undue election." (See, also, McCrary on Elections [3d ed.], §§ 123, 124; Paine on Elections, §§ 327–330.) The circumstances which do not affect the result when the place designated for the holding of the election has been changed are shown in *Preston* v. *Culbertson*, 58 Cal. 209, wherein the court holds: "The polls were opened a short distance from, and in plain view of the place appointed, the owner of the house selected having objected to the election proceeding at his house, and it does not appear that any voter was misled or deprived of his vote ·by reason of the change." (*Dale* v. *Irwin*, 78 Ill. 180.) There was no error in the action of the court respecting the returns from this precinct.

The third and last finding is as follows: "That at the precinct at Bonner, 66 illegal votes were cast for said office of sheriff, and which said number of votes are to be deducted from the whole vote of said precinct for said office; that said .66 illegal votes be apportioned to and deducted from the whole vote received by contestant, Daniel J. Heyfron, and contestee, Cain B. Mahoney, at said precinct of Bonner, in the same proportion that the vote of each of said parties bears to the whole vote cast at said precinct, to wit, 15 votes from the vote of contestant, Daniel J. Heyfron, and 51 votes from the vote of contestee, Cain B. Mahoney, leaving 120 votes cast for Cain B. Mahoney at said precinct, and 36 votes cast for contestant, Daniel J. Heyfron, at said precinct." It is the contention of the appellant that there is no testimony to prove that 66, or any other number of illegal votes were cast at this precinct for him for the office of sheriff, or for the office of sheriff. The statement of contest alleges that 120 "men, who were not legal voters of the county of Missoula, voted for said Cain B. Mahoney for sheriff." After giving a list of the names, the eleventh ground concludes: "Not one of the said men had been in the county of Missoula thirty days preceding said election, not one of them had been in the Territory of Montana six months preceding said election, and every one of them voted for Cain B. Mahoney at said election, and were counted for him by said board of canvassers." Another ground in the statement concerning some of the persons who voted for Mahoney for said office is stated

thus: "No one of whom had legally declared his intention to become a citizen of the United States prior to said election; no one of said persons went to the office of the clerk of the District Court to make said declaration; but the deputy of said clerk left his office, and took the declaration of each one of said persons in the county at a distance from his office, and that was the only declaration of such intention any one of them made." The finding of the court is general; the illegal voters are not named or otherwise identified, and the nature of the disqualification is not pointed out. There is no proof, outside of the official returns, that any ballots were cast for Mahoney or Heyfron. While we do not deem the evidence clear or satisfactory, there is testimony which tends to prove that laborers upon a railroad in the vicinity of the precinct at Bonner voted at this time, and that they had not resided in the county of Missoula thirty days before that election. The rule is settled by this court that the finding is like the verdict of a jury, and, under the circumstances appearing in the record, cannot be disturbed. We refrain, therefore, from an examination of the other ground, affecting the illegality of voters of foreign birth.

The appellant relies upon *McDaniels' Case*, Brightly's Leading Cases on Elections, 249, where it is said: "But if the individual do not know for whom he voted, and the fact cannot be established by other evidence, then the complaint must fail for want of proof, like any other cause which is lost for want of sufficient evidence to sustain it." This case, however, related to the illegality of only one voter, whose ballot would decide the contest, and the opinion states correctly the law which is applicable to the facts of that controversy, but has no bearing upon the question before us. Mr. McCrary says, in his work on Election: "But it does not follow that such illegal votes must necessarily be counted in making up the true result, because it cannot be ascertained for whom they were cast. In purging the polls of illegal votes, the general rule is that, unless it be shown for which candidate they were cast, they are to be deducted from the whole vote of the election division and not from the candidate having the largest number. Of course, in the application of this rule such illegal votes would be deducted proportionately from both candidates, according to the entire vote returned for each." (§ 460,

3d ed.) He continues: "Let it be understood that we are here referring to a case where it is found to be impossible, by the use of due diligence, to show for whom the illegal votes were cast." (§ 462.) Mr. Paine, in treating this subject, writes: "Where illegal votes have been cast, the true rule is to purge the poll by first proving for whom they were cast, and thus ascertain the real vote; but if this cannot be done, then to exclude the poll altogether. This is safer than the rule which arbitrarily apportions the fraud among the parties." (Paine, Elec. § 513.) Under the authorities, it was proper for the court to exclude the entire vote of the precinct of Bonner, or apply the rule of apportionment to the facts. In either event, the same judgment would be entered against the appellant. While it may be the safer rule to reject the whole vote of a precinct which is tainted by fraud or illegality, we cannot conclude that the court erred in pursuing a different mode to arrive at a like end. The result of the findings was to give Mahoney 1,776 votes, and Heyfron 1,788 votes, and the contestant was declared elected to the office in dispute.

During the trial, Heyfron obtained leave to amend his statement of contest to conform to the proof by changing the following names, which are specified in the aforesaid eleventh ground, to wit: "William McCarthy to read William McGarry, W. Bugg to read N. Berg, Louis Gunther to read Louis Guenter, Wade Beck to read Wade Beach," etc. Eight names were also added to the list therein. The appellant insists that the court erred in allowing these amendments to be made. Mr. McCrary says: "It may be stated, as a general rule, recognized by all the courts of this country, that statutes providing for contesting elections are to be liberally construed, to the end that the will of the people in the choice of public officers may not be defeated by any merely formal or technical objections. Immaterial defects in pleadings shall be disregarded; necessary and proper amendments should be allowed as promptly as possible." (§ 396, 3d ed.) "In most of the States of the Union, there are statutes to regulate pleadings, under which courts are authorized to allow amendments where petitions or other pleadings are found to be defective, and under most of these statutes a petition in a contested election case may be amended. In the absence of any

statute of this character, the court trying a case of contested
election may, under its general common-law power, permit such
a petition to be amended; and an amendment ought to be
allowed whenever the court, in the exercise of a sound discre-
tion, shall be of opinion that the ends of justice will be thereby
promoted." (§ 406.) This author continues further: "If,
therefore, an amendment of a petition would necessarily result
in a continuance, or in considerable delay, it ought not to be
permitted, because it is better that he whose fault it is that the
original petition is insufficient should suffer than that an inno-
cent party should be deprived of his right to a speedy trial.
In such a case, the futherance of justice requires that leave to
amend should be refused." (§ 407.) In *Election Cases,* 65 Pa.
St. 34, the court says: "And, in point of reason, why should
the court not have power to amend in a contested election case?
It is a judicial remedy, and concerns important rights. . . . .
It would be an intolerable technicality if the petitioners were
required to set forth in their complaint, within ten days after
the election, every illegal vote, every illegal act of the election
boards, and every instance of fraud. Such a nicety would pre-
vent investigation, and defeat the remedy itself." (See Paine,
Elec. §§ 827, 840, and cases cited.) We have upheld in a liberal
spirit the action of courts in permitting amendment to pleadings,
and executing the provisions of the Code of Civil Procedure.
Under the authorities, this principle embraces election contests.
The effect of the first amendment was to correct the spelling of the
names of persons, who could have been distinguished by the court
without this change. The addition of the other parties was not
sufficient to control the judgment. The appellant did not allege
that he was surprised by this ruling, or ask for a continuance,
and we do not think the court abused its discretion in this
matter.

The court received in evidence a subpœna issued out of the
office of the clerk of the court below in December, 1888, with
the return of the coroner thereon, showing that he was unable
to find 118 persons therein named. They comprise the names
of the voters in the precinct of Bonner, against whom the con-
testant preferred the charge of illegality. The subpœna and
return are *prima facie* evidence of some matters which are con-

nected with the case. They tended to prove that the contestant made a proper effort to secure the attendance of these witnesses, and· explained his failure to produce them upon the trial, and enabled the court to understand the cause of the omission to bring before it the best evidence. Considered from any standpoint, we cannot see how their introduction prejudiced the appellant.

The judgment is affirmed with costs.

HARWOOD, J., and DE WITT, J., concur.